ODOM, Justice.
 

 This is a suit for damages, grounded on allegations that plaintiffs have suffered intensely from nervous and physical shock,
 
 *536
 
 mental anguish, pain, worry, and humiliation, resulting from the desecration and disturbance by defendants of the graves and tombs of two of their near relatives and the profanation of the entire cemetery where these relatives are buried, which cemetery to them is a sacred place.
 

 Plaintiffs allege that they buried their father, William Blanton Humphreys, and their sister, Mrs. Melissa Humphreys Macy, in the Evangeline Cemetery in Acadia Parish in the early part of 1893; that the Evangeline Cemetery is a one-acre plot of ground, dedicated to church and cemetery purposes, and that they and other members of their family have continuously since that time been in peaceable and uninterrupted possession of the burial plots, graves, and tombs of their father and sister; that they and others who have relatives buried there have, through all the years since the Evangeline Cemetery was established, kept up the grounds and the fences, looked after and maintained the graves and monuments there in a manner commensurate with their means and circumstances in life. They charge that Frank W. Bennett, one of the defendants, did in May, 1937, without any legal right, trespass upon the cemetery grounds by tearing down a part of the fence enclosing them and by drilling a well in the cemetery for the production of oil; that his successor, the Bennett Oil Corporation, continued the drilling operations and drilled a second well thereon; that the drilling operations were continuous from May, 1937, until March, 1938, in utter contempt of their rights, feelings and sentiments; that defendants were trespassers, and that the trespasses and wrongs thus committed damaged plaintiffs by causing them to suffer great mental and physical shock, mental pain, anguish, and suffering. They pray for damages amounting to $20,000 against each of the defendants, Frank W. Bennett and the Bennett Oil Corporation.
 

 After the suit was filed, Mrs. Minerva Wilkins, nee Humphreys, one of the plaintiffs, died intestate, and her three daughters were substituted as plaintiffs in her stead.
 

 This being a personal action, and Frank W. Bennett, one of the defendants, being an absentee, the suit was dismissed as to him on exception to the jurisdiction ratione personae.
 

 The Bennett Oil Corporation, the other defendant, filed an exception of no cause or right of action, which was overruled. This exception has been abandoned.
 

 The oil corporation filed answer, in which it admitted plaintiffs’ allegations in so far as they relate to the burial of plaintiffs’ father, sister, and others in the Evangeline Cemetery. But it denied that it was indebted to plaintiffs in any sum whatever. It especially denied that the one-acre plot of ground, known and referred to as the “Evangeline Cemetery”, was ever legally dedicated to the public for church and cemetery purposes, and for that reason denied that “plaintiffs have now, or ever had in the past, the legal right, or any other right, to bury their dead in and on said one acre tract, or to enter same, or any right of access thereto”. It admits, however, that on October 14, 1895, Mrs. Milia T. Tomlin-son, the owner of the tract of land on which the Evangeline Cemetery is located, by written instrument duly recorded, granted
 
 *538
 
 to a religious organization “the right of occupancy for church and cemetery purposes of the one acre tract in question”, and admits that by act dated September 6, 1904, said religious organization “transferred all of its rights and privileges in and to said tract of land” to another religious organization, and that “the use and occupancy of said one acre for church and cemetery purposes has been under the exclusive dominion and control of the two religious associations herein named from the time of their respective acquisitions thereof”.
 

 Defendant admitted that two producing oil wells had been drilled on the one-acre cemetery plot, and alleged that said drilling was done under and according to .the provisions of an oil, gas, and mineral lease granted to Frank W. Bennett on April 22, 1937, by the Tomlinson heirs, the owners of the cemetery plot, and the religious association to which the right of occupancy for church and cemetery purposes had been granted, and it pleads the right acquired under this lease contract in defense of the action for damages brought by the plaintiffs, and “denies that plaintiffs herein have suffered any damage or injury as a result of any operations conducted by appearer herein” for which defendant may be held liable.
 

 The case was tried by jury and resulted in a verdict of $10,000 in favor of William Fletcher Humphreys, son of William Blanton Humphreys and brother of Mrs. Melissa Humphreys Macy, who were buried in the cemetery, and a verdict of $3,333.33 in favor of each of the three daughters of Mrs. Minerva Wilkins for injuries suffered by their mother. The defendant brought the case here on appeal.
 

 This damage suit is brought under Article 2315 of the Revised Civil 'Code, which declares that “Every act whatever of man that causes damages to another, obliges him by whose fault it happened to repair it”.
 

 This court has repeatedly held that an action lies to recover damages for mental anguish, pain, and suffering caused by the fault of another, and that damages may be assessed “without calculating altogether on the pecuniary loss, or the privation of pecuniary gain to the party”. Civil Code, Articles 1934, 2315; Lewis v. Holmes, 109 La. 1030, 34 So. 66, 61 L.R.A. 274; Graham v. Western Union Telegraph Co., 109 La. 1069, 34 So. 91; Parker v. Crowell & Spencer Lumber Co., 115 La. 463, 39 So. 445; Marx v. Louisiana Western R. Co., 112 La. 1085, 36 So. 862; Bourg v. Brownell-Drews Lumber Co., 120 La. 1009, 45 So. 972, 124 Am.St.Rep. 448; Dobyns v. Yazoo & M. V. R. Co., 119 La. 72, 43 So. 934.
 

 Counsel for defendant concede that this rule is well established in our jurisprudence, but they seriously deny that defendant’s drilling operations in the cemetery caused plaintiffs to suffer mental anguish and pain, shock and humiliation. They argue that, if it be conceded that plaintiffs have suffered damages, defendant is not liable therefor, under the circumstances disclosed by the record.
 

 Counsel base this argument on the premise asserted by them that the Evangeline Cemetery, in which plaintiffs buried their
 
 *540
 
 relatives, was never dedicated by the owner of the land to use for cemetery purposes, according to the forms and requisites prescribed by law, and that therefore these plaintiffs had no legal right to bury their dead there, and, having no such legal right, they now have no legal cause of complaint against the defendant, even if it be conceded that the drilling operations amount to a desecration of the cemetery, as they allege. Counsel argue also that, even if it be true that this one-acre plot of ground was legally dedicated to the public for church and cemetery purposes, the Tomlinsons, the churches, and the defendant had a legal right to make such private use of the cemetery plot as they saw fit, so long as they did not, by such use, physically invade the graves themselves and disturb the tombs and the ashes • of the dead.
 

 We cannot concur in the view expressed by able counsel for the defendant that plaintiffs have no right of recovery in this case, under the circumstances disclosed by the record. As to the dedication of the Evangeline Cemetery for church and cemetery purposes, the admitted facts are that Dr. Andrew D. Tomlinson and his wife came to Louisiana from Indiana in 1871 and established their residence, or “settled”, in the Evangeline Country in Acadia Parish. Dr. Tomlinson was an ordained minister of the gospel and a member of a religious organizatión or association known as “The Iowa Yearly Meeting of Friends”, commonly known and referred to as the “Quaker Church”. Soon thereafter, other families, affiliated with the same church, came from Indiana to Louisiana and established homes in the same section of the Evangeline Country. Among these families were the Humphreys, the ancestors of plaintiffs. Dr. Tomlinson and the other families organized a Quaker church, of which he was the first minister. These settlers selected a plot of “high ground” for a cemetery and began to use it as such about 1887 or 1888. There was no formal dedication of the cemetery, but the plot of ground selected was used as a community burial ground, as is the custom in rural sections. The land on which this cemetery was located seems to have been vacant at that time, but later on Dr. Tomlinson made a homestead entry covering the tract of land on which the cemetery was located. The date on which he made his homestead entry is not disclosed by the record, but it does appear that he and his wife resided on the land covered by his entry up to the date of his death in the latter part of 1892. He did not perfect his entry, but his widow did and received • patent for the land on October 3, 1894.
 

 In August, 1892, not long prior to his death, Dr. Tomlinson, assisted by three others, one of whom was William B. Humphreys, the father of these plaintiffs, laid off and established the four corners of this one-acre cemetery plot, which, as stated, was a part of the land covered by his homestead entry. Up to that time, numerous' persons, including some of his relatives, had been buried in the plot. The testimony and his laying out of the plot as he did unmistakably show that he intended to dedicate it to the public for use as a cemetery. He made no formal dedi
 
 *542
 
 cation of the plot for the reason, no doubt, that he had not perfected his title to the land. But his widow, to whom the land was patented in 1894, did formally dedicate it to church and cemetery purposes in October, 1895. In that month she executed a notarial act, reciting that- she “does by these presents and in consideration of the sum of one dollar cash in hand paid, receipt whereof is hereby acknowledged, grant, bargain, sell, convey, set over and deliver unto Robert Bailey, Nathan Kirk and Elam Jessup, Trustees of Iowa Yearly Meeting of Friends, the following described property, to-wit”. The cemetery plot is described by metes and bounds, and immediately following the description is this clause:
 

 “To have and to hold the said property unto said purchasers, and their successors in office,
 
 for cemetery and church purposes
 
 free from any incumbrances, whatsoever, with full and general warranty of title.” (Italics are the writer’s.)
 

 Counsel for defendant repeatedly state in their brief that this instrument shows on its face that it is an act of sale pure and simple, and shows that Mrs. Tomlin-son intended to vest a fee simple title to the acre plot in the religious association, or Quaker church. If this instrument stood alone in the record, there might be plausible argument to support counsel’s theory, but it does not stand alone. There is another instrument in the record which shows conclusively, we think, that neither did Mrs. Tomlinson intend to convey, nor did the trustees intend to acquire, a fee simple title to the land. The other instrument is a private act acknowledged before a notary, executed in 1904, reciting:
 

 “That we, Milea T. Tomlinson, for herself and * * * Trustees of Iowa Yearly Meeting of Friends of the State of Iowa, do hereby and by these presents and in consideration of the sum of One Dollar cash in hand paid, receipt whereof is hereby acknowledged, do hereby sell * * * and deliver unto The United Brethren Church in Christ * * * the following described property, to-wit.”
 

 The property described is the Evangeline Cemetery plot and bears the same description as that referred to in the first instrument executed by Mrs. Tomlinson. Following the description is this clause:
 

 “The said Vendees to have and to hold said property for themselves, their successors and assigns,
 
 for church and cemetery purposes, as was originally intended by the said Milea T. Tomlinson who also appears herein and signs 'this act giving her approval and consent to this transfer and conveyance."
 
 (Italics are the writer’s.)
 

 It will be observed that this instrument, like the first one, recites that the church is to have and to hold the plot “for church and cemetery purposes”, and observed further that this instrument contains the stipulation “as was originally intended by the said Mrs. Milea T. Tomlinson who also appears herein and signs this act giving her approval and consent”.
 

 If, by executing the first act, Mrs. Tomlinson intended to convey to the church a fee simple title to the' lot, without re
 
 *544
 
 strictions, there would have been no necessity, for her to make herself a party to the second instrument to give her consent and approval to the transfer. The recital in the second instrument that the plot was transferred to the church for church and cemetery purposes, as originally intended by Mrs. Tomlinson, and that she made herself a party to the act to give her approval and consent, shows unmistakably, we think, that her intention always was to retain the fee title and to set the lot apart for church and cemetery purposes, to be devoted and consecrated to those purposes only. She evidently intended merely that the church should have supervision and control of the use of the ground for those purposes. The second instrument did no more than shift the supervision and control from one church to another, and she made herself a party to the act to approve the shift.
 

 The oil and mineral lease under which defendant drilled was granted, not by the church alone, but by the church and Allen U. Tomlinson and Anna Louise Tomlinson, the sole heirs of Mrs. Milia T. Tomlinson. This indicates that it was thought at the time the lease was granted that the Tomlinson heirs had the fee title to the plot.
 

 The argument now made by counsel that Mrs. Tomlinson vested a fee title to the plot in the churches is wholly inconsistent with their pleadings as shown by Paragraph 6 of the answer, which reads in part as follows.
 

 “Your appearer admits that by an instrument dated October 14, 1895, the owner of that portion of Section Forty-one, Township Nine South, Range Two West, in which the tract of land described in plaintiffs’ petition is located, Mrs. Milia T. Tomlinson granted to the Iowa Yearly Meeting of Friends, a religious organization, the right of occupancy for church and cemetery purposes of the one acre tract in question. * *
 
 *
 
 That the title to said one acre tract of land remained in said Milia T. Tomlinson until her death, and then became vested in her heirs, to-wit: Allen U. Tomlinson and Anna Louise Tomlinson, who have remained the owners up to the present time, subject to the rights granted to the Iowa Yearly Meeting of Friends and thereafter transferred to the United Brethren Church in Christ as herein set out. That the right of oc-, cupancy of said one acre tract for church and cemetery purposes is now, and has been since its acquisition as herein set out, vested in the United Brethren Church in Christ."
 

 According to counsel’s original interpretation of these instruments, as shown by their answer, the instruments do not mean what counsel now say they mean. Their original interpretation of them is the correct one. While she retained title to the ground, Mrs. Tomlinson unquestionably intended to set it apart, or dedicate it, for specific purposes. “Dedication” is “A devoting or setting aside for any particular purpose” (Webster). See also “Dedication” in Words and Phrases.
 

 Counsel for defendant cite in their brief several cases decided by this court holding that a dedication of property
 
 *546
 
 for any public use is never inferred, but on the contrary the intent on the part of the owner to dedicate must be shown. It is needless to cite and review those cases. It suffices to say that it is settled in this state and at common law that the vital principle underlying dedication is the intention to dedicate, and, so far as the owner is concerned, the dedication is made when such intent on his part is unequivocally manifested. It is settled also that, when the public, or those in whose favor the dedication is made, accept and make use of the property for the purpose intended, the dedication is complete.
 

 In the case at bar, the intention to dedicase this plot of ground to' use as a cemetery was first unequivocally manifested by Dr. Tomlinson in 1892 when he, with the assistance of others interested, laid off and established its four corners. It was then being used as a burial ground and had been so used for many years prior thereto. It was part of his property, and his marking it off as he did shows clearly that he intended to segregate it from his other property. His wife kept a record-book showing the names of those buried there, each grave-lot bearing a number. This record was made in her handwriting, and it is conceded that permits were granted for the burials at the time or before the record was made. She kept and made entries in this record-book until she turned the plot over to the church, and thereafter the book was kept and entries made therein by the proper officers of the church.
 

 Plaintiffs’ father and sister were both buried in this cemetery in 1893, after Dr. Tomlinson’s death and before his widow received patent to the land. The record book shows that they were buried in Lot No. 30 of the cemetery, their graves being Nos. 1 and 2, and it is admitted that this record is in the handwriting of Mrs. Tomlinson, and that the interments were made with her consent.
 

 The testimony shows that the use of this plot for cemetery purposes was never abandoned, that it was so used continuously as a community burial ground from about 1887 down to 1937, when the drilling operations were begun. It was enclosed by a wire fence, and tombs and slabs were erected to mark the graves.
 

 It is Our opinion, and we hold, that the dedication of this plot of ground for cemetery purposes was complete, and, since plaintiffs relied in good faith on the dedication made by the owners of the land and buried' their relatives there under permits, it follows that they acquired rights therein which could not be divested by any subsequent disposition made of the property either by the fee owners-or the churches, or both.
 

 The one-acre plot of ground having been set apart for a cemetery and its use for that purpose having been accepted by these plaintiffs, and many others, neither the fee
 
 owners
 
 nor the churches could later use, or empower another to use, it for any purpose inconsistent with the use for which it was dedicated. The Tomlin-son heirs acquired the fee title to this ground by inheritance. But they acquired no greater right in the soil than their, ancestors had. By setting this plot of.
 
 *548
 
 ground apart for cemetery purposes, Dr. Tomlinson and his widow gave solemn assurances to the living that they might use it as a place for the final repose of their dead. In so doing, they reserved to themselves no other rights in the soil than such as were perfectly compatible with the free and full exercise and enjoyment of the use to which they had devoted the property. Neither could they while living, nor can their heirs now, break faith with those who relied upon such assurances. The principle, of estoppel will not permit the withdrawal of such solemn promises upon which others have acted in perfect good faith.
 

 These principles were recognized and declared by this court in the case of Choppin et al. v. Dauphin, 48 La.Ann. 1217, 20 So. 681, 683, 33 L.R.A. 133, 55 Am.St.Rep. 313. The facts in that case were that the remains of certain members of the Choppin family were deposited in a tomb owned by Dr. Dauphin. ■ Dr. Choppin and Dr. Dauphin were friends, and the latter, who owned the tomb, requested the former to place the remains of certain members of the Choppin family in his, Dr. Dauphin’s, tomb, with assurances that the tomb should be the permanent sepulcher of the Clioppins. Dr. Dauphin’s widow as his legatee attempted to remove these remains, her claim being that she had the right to do so as the owner of the tomb, which was real estate. Members of,the Choppin family sued to enjoin the removal of the remains on the ground that Dr. Dauphin had given verbal-assurances that these should never be disturbed. The court held that the widow, as legatee of Dr. Dauphin, owned the tomb in fee, but sustained the contention made by the Clioppins that the remains of their dead relatives could not be removed because of Dr. Dauphin’s assurances that the tomb might be used as a final resting place for the members of the Choppin family.
 

 On application for rehearing, the court said that, while it recognized that the legal title to the tomb was in defendant, it was confronted with “another species of interest or form of title claimed to have been brought into existence by the declarations and conduct of Dr. Dauphin in his lifetime, but not within the recognition of the Code” (the Revised Civil Code).
 

 Speaking of the verbal promise made by Dr. Dauphin that his tomb might be used by the Choppins as a place of final repose for their dead, the court said:
 

 “In our view, wholly irrespective of any issue of title, neither Dr. Dauphin in life nor his legatee after his death could recall that promise, and require the removal of remains deposited on the faith of this pledge of final sepulture.”
 

 The following cases are in point here: Niles v. City of Los Angeles, 125 Cal. 572, 58 P. 190; Hibberd v. Mellville, 3 Cal. Unrep. 879, 33 P. 201; Smith v. City of San Luis Obispo, 95 Cal. 463, 30 P. 591; Harding v. Jasper, 14 Cal. 642; Quinn v. Anderson, 70 Cal. 454, 11 P. 746; Gardiner v. Tisdale, 2 Wis. 153, 60 Am.Dec. 407.
 

 Counsel for defendant say that the ruling in the case of Choppin v. Dauphin, supra, has no application to the case at bar because there the suit was to prohibit the removal of the remains from a tomb,
 
 *550
 
 and here the suit is to collect damages for mental anguish and suffering caused by the desecration of the cemetery and the graves therein. The case is in point, because the court there recognized the rule which prevails in other jurisdictions that, when once real estate is set apart and used for a final resting place of the dead, the owner cannot thereafter make another use of it inconsistent with that to which it was devoted. And it was held also that, while the plaintiffs had no “ownership” in the tomb in a strict legal sense, yet they did have “another species of interest or
 
 form
 
 of title * * * not within the recognition of the Code”.
 

 So, in the case at bar, while plaintiffs do not own, in a strict legal sense, an interest in the cemetery, they do have a “species of interest or form of title” therein.
 

 The defense set up by defendants and the arguments in support of it, that these plaintiffs had no right to bury their dead in this cemetery and that they never at any time had rights of any nature in the cemetery, are without merit.
 

 It is admitted that this small Evangeline Cemetery, consisting of a one-acre plot of ground, was literally converted into an oil field by the drilling thereon of two producing wells. By ■ such use, this consecrated ground, which was destined for the peaceful slumber of the dead, was transformed into an industrial site, to be exploited for material gain. In order to extract the oil from the ground, defendants erected on the cemetery plot all such machinery and accessaries as are ordinarily used in that process. Two derricks, a tool-shed, two storage tanks, a mud box, a mud tank, and pipe-racks were erected. Four engines and boilers, mud pumps, and pipelines for conveying slush from the wells to the pits and from the pits back to the wells were used. Two excavations six feet deep were made on the premises for slush pits. One' of the oil wells is about forty feet from the Humphreys’ grave-lot, and one of the storage tanks is only eight or ten feet from the graves. The two pipelines for the conveyance of the slush are elevated about four feet above the ground and run over one corner of the Humphreys’ grave-lot within eight feet of the tomb, but not over the graves themselves. Shrubbery and flowers planted near the Humphreys’ graves were trampled under foot and destroyed. There was mud and slush over some portion of the cemetery plot, which made access to the graves unpleasant and inconvenient. The mud and slush did not cover the graves, nor were the monuments defaced by it.
 

 This use of the cemetery plot divested it of its sacred character, violated and profaned the sanctity of the graves. This was a desecration calculated to wound the feelings of the living who had relatives buried there. It was a tort, a wrong inflicted upon them, which gave rise to an action for damages resulting from the mental anguish suffered.
 

 The graves and tombs of plaintiffs’ relatives were not physically disturbed, but other graves in the cemetery were. This is denied by some of defendant’s witnesses, but it was proved to our satisfaction.
 
 *552
 
 There is testimony in the record that a marble slab, once used to mark the grave of a child, was placed at the door of the office building and used as a step.
 

 There is no merit in the contention that plaintiffs have no right of recovery in the absence of proof that the graves of their relatives and the monuments erected by them were physically disturbed ; nor is there merit in the contention that the court has no right to consider the testimony admitted to show that other graves in the cemetery were in fact destroyed. This testimony was admissible to show the desecration generally of the entire cemetery. These plaintiffs have an interest not only in the particular spots where their relatives are buried, but also a sentimental interest, at least, in the cemetery as a whole, and therefore such flagrant violation, as here shown, of the sanctity of any part of this small plot was calculated to cause mental anguish and suffering to those who have relatives buried there.
 

 Regardless of the laws and rules relating to the ownership and control of real property, when a plot of ground is set apart for cemetery purposes, and burials are made in the land, the ground changes its character in the minds and feelings of the community. “It assumes a sacred quality that overrides conveyancers’ precedents and requires freedom from profanation until, by abandonment and removal of the bodies or by complete disintegration, there remains nothing to appeal to the emotions of the survivors.” The Law of Cadavers, by Jackson, p. 206.
 

 The word “cemetery”, says the Encyclopedia Britannica, is derived from a Greek term which means “to sleep” and which denotes “sleeping place”. There is a sentiment deeply seated in the human heart that a cemetery, or “sleeping place” of the dead, is sacred ground. Instinctively we resent any rude invasion of, or approach to, ground set apart as a resting place for the dead. Deference to this sentiment and respect for the feelings of those who have deposited the remains of their relatives in burial fields usually restrain others from violating the sanctity of such places. A ruthless desecration of any cemetery shocks the moral sense of mankind.
 

 The Evangeline Cemetery was explored for oil in utter disregard of the rights, feelings, and sentiments of all those who have buried their relatives there. This invasion was deliberate. The parties to the lease contract seem to have proceeded upon the theory that the right to explore the cemetery for oil was superior to the right of interested living persons to have the remains of their dead left where they were deposited. This is shown by the lease contract, which stipulates that those interested may, if they desire, remove dead bodies from their graves at the expense of the lessee. The contract shows further that the parties contemplated that the drilling operations might cause litigation, for it provides that all costs of such litigation as might arise should be paid by the lessee. Apparently, the lessees were willing to take the chances, and they did.
 

 That Mr. Humphreys and his sister, Mrs. Wilkins, who brought this suit, suf
 
 *554
 
 fered extreme mental anguish and pain on account of the acts of desecration committed by defendants was proved beyond question. Mr. Humphreys testified that his mental suffering was constant and severe. His health has so completely broken down since the drilling operations were begun that he collapsed a few days before the trial and could not enter the courtroom without assistance. He testified that worry, caused by what he saw at the cemetery, brought about his decline. One of his daughters, a school teacher, who lived with him, testified that, prior to these events, her father was in good health, but that, after the drilling operations were begun, she saw a radical change in his mental and physical condition; that she had on many occasions gone to him when he had been alone and found him weeping, and that he was constantly worried and depressed.
 

 As to Mrs. Wilkins, the other plaintiff, who died not long prior to the trial, the testimony shows that she, too, was greatly affected. She was a religious woman, deeply devoted to her family. Dr. Wilkins, her husband, testified that, when the drilling was mentioned, tears came to her eyes, and that she was “always pleading that it be stopped”. She died, he said, from complications resulting from influenza. One of her daughters, who lived in the house with her, said that, when the question of drilling was brought up, her mother shed tears and “became emotionally upset”; that a complete change came over her;- that her mother was “wrecked”. Two other daughters and a son-in-law gave similar testimony. Whether the mental anguish and worry suffered by them contributed to the death of Mrs. Wilkins and to the collapse of Mr. Humphreys was not definitely shown. No medical experts were called by either side. Dr. Wilkins expressed no positive opinion as to this point. He went no further than to say that persons suffering mental anguish were more vulnerable to disease than others. Mr. Humphreys is about 72 years old, and Mrs. Wilkins was about 70 when she died.
 

 The measure of damage in cases of this kind can never be fixed with any degree of certainty. The quantum allowed must be left to the discretion of the trial judge or jury, the award, of course, being subject to modification by the appellate court. While we think defendant was guilty of flagrant wrongs, we think the amount of $20,000 assessed by the jury is excessive. There are mitigating circumstances in favor of the defendant, which were perhaps , overlooked by the jury. One is that plaintiffs could have stopped the drilling operations by injunction and thereby mitigated their suffering and the resulting damages. Another is that the Bennett Oil Corporation was not responsible for all the depredations. Frank W. Bennett drilled the first well, and the corporation the second. The judgment is against the corporation alone, because Bennett succeeded in having the suit dismissed as to him.
 

 In view of all the circumstances, we think an award of $3,000 in favor of Mr. Humphreys and a like amount in favor of the three daughters of Mrs. Wilkins, for
 
 *556
 
 damages suffered by their mother, would be ample.
 

 For the reaasons assigned, the verdict and judgment appealed from are amended by reducing the amount awarded to William Fletcher Humphreys to $3,000, and by reducing the amount awarded to the daughters of Mrs. Minerva Humphreys Wilkins to $3,000, or $1,000 to each, and as thus amended the judgment is affirmed; the defendant to pay all costs.
 

 O’NIELL, C. J., does not take part. „