225 So.2d 691 (1969)
Delton VIDRINE et al., Plaintiffs-Appellees,
v.
Levie A. VIDRINE, Defendant-Appellant.
No. 2697.
Court of Appeal of Louisiana, Third Circuit.
August 7, 1969.
Rehearing Denied August 26, 1969.
*692 Preston N. Aucoin, Ville Platte, for defendant-appellant.
Donald Soileau, Mamou, for plaintiff-appellees.
EN BANC.
MILLER, Judge.
Delton Vidrine, et al, seek to declare public the "Te Mamou Cemetery" located in Evangeline Parish, three miles from Ville Platte, to define its boundaries, and to enjoin defendant, the record landowner, from collecting for grave sites and/or interfering with the public's use of the property as a cemetery. Defendant appeals from the judgment rendered in favor of plaintiff.
Plaintiffs have relatives buried in the cemetery and plaintiff Delton Vidrine has for several years been in charge of funds contributed by families of the departed for the purpose of maintaining the cemetery. It is noted that defendant landowner Levie A. Vidrine contributes to this fund and has never interfered with Delton Vidrine's work in this regard. This suit was filed shortly after defendant refused to allow Delton Vidrine to bury a member of his family in the cemetery without first paying $35.00 for the gravesite.
It was well established that defendant never interfered with anyone's efforts to visit and/or care for graves in the cemetery. It is presumed that defendant does not object to that portion of the judgment prohibiting him from interfering with public use of the property as a cemetery. Defendant contends only for the right to charge for gravesites.
The cemetery occupies 9/10ths of an acre. fronts U. S. Highway 167 on the west, A fence separates the cemetery from defendant's property located north, east and south of the cemetery. The cemetery where there is no fence.
The record indicates that defendant, his father, and grandfather before him have paid taxes on this cemetery property, but it was definitely established that all defendant need do to remove this 9/10th acre comprising the cemetery from the tax rolls is to make such a request to the parish assessor.
Plaintiffs contend that the "Te Mamou Cemetery" was dedicated as a cemetery by *693 act dated December 25, 1863, wherein Charles Teal, Sr. declared that one-half acre of his plantation near Ville Platte, Louisiana, where his wife Sarah Cochrin, was buried, was to be set off as a family burying ground for the Teal family, relatives and friends. However, there is nothing in the record to indicate that Charles Teal, Sr. ever owned property in that neighborhood. Testimony that Sarah Cochrin, wife of Charles Teal, Sr., was buried there was not convincing, and the trial judge pretermitted this issue.
There are more than one hundred graves in the "Te Mamou Cemetery" (one witness estimated as many as 600), some of which date back to the middle 1800's. Testimony concerning the manner in which families obtained permission to bury in the cemetery was evenly divided. Basically, plaintiffs' witnesses were certain that payment was not required for burial plots until the five year period immediately preceding this suit. Nevertheless, some of plaintiffs' witnesses admitted that they sought permission from defendant (or his father or grandfather), prior to selecting and/or being assigned a burial plot. Defendant's witnesses verified that they paid for burial plots and/or knew that this custom was of long standing. Defendant testified that his family had always either charged for the lots or had given them to relatives or friends and that there were a number of burial plots paid for and being reserved for several different families. There was evidence that burial plots originally sold for $2.00 each, then $5.00, then $10.00, then $25.00 and within the past five years for $35.00 each.
The trial court found, and we agree, that about 18 to 20 years before this suit was filed, defendant's father added some of his property to the cemetery by moving the east fence approximately 65 feet to the east. There was testimony that the north and south fences had been moved small distances so that more of defendant's property was enclosed in the "Te Mamou Cemetery". The fact that landowner continued to add land to the cemetery to some extent suggests that defendant and/or his ancestors may have received some financial return for the cemetery lots.
On the other hand, the record contains impressive testimony to the effect that many of the gravesites were furnished free of charge. But the record is just as impressive that many who obtained these free gravesites were related to defendant landowner. Indeed, Delton Vidrine, the original plaintiff (others later joined as parties plaintiff), is related to defendant, Levie A. Vidrine.
On these facts the trial court held and appellee now contends that "irrespective of title or ownership of the land, there has been a dedication here, as a public cemetery and public graveyard, and defendant no longer has any rights of proprietorship, ownership or control of this cemetery plot, greater than any other members of the public."
While we agree that there has been a dedication of this property as a public cemetery, we differ with the conclusion that defendant has lost his rights of ownership and control of those parts of the cemetery which have not been sold or which are not occupied by graves.
EXCEPTIONS OF NO CAUSE OF ACTION AND/OR NO RIGHT OF ACTION.
Appellant argues that these exceptions must be sustained since plaintiffs are not seeking to determine boundaries, nor are they seeking damages. Appellant contends that there is no such thing as an action to declare a cemetery public.
While the case of Locke v. Lester, 78 So.2d 14 (La.App.2nd Cir. 1955) is concerned with a boundary dispute, rather than an action to declare a cemetery public, we find appropriate the following language of that decision:
"Defendant's exception of no cause or right of action also raises the issue of *694 whether or not plaintiffs have sufficient interest to entitle them to institute this action. Article 15 of the Code of Practice declares that an action can only be brought by one having a real and actual interest, but as soon as that interest arises he may bring his action. Plaintiffs, it must be conceded, do not have a recorded title to so much as even a burial plot within the cemetery tract. Their legal right to bring this action may rest upon purely a personal interest in preserving the graveyard since it is the burial ground of members of their family, or because each of them may wish to be buried alongside their departed relatives or the legal right can be said to belong to any citizen of the community. No express statutory right of action is given plaintiffs, yet it is generally recognized there are a number of cemeteries such as the one in the instant case where the ground has been set apart for general public use, is regarded by the community as sacred soil, and a cause of action is allowed a litigant when the graves of his family in such a public cemetery are disturbed or desecrated. Humphreys v. Bennett Oil Corporation, 1940, 195 La. 531, 197 So. 222. * * *" 78 So.2d 14, 16.
See also Choppin v. Dauphin, 48 La.Ann. 1217, 20 So. 681, 33 L.R.A. 133 (1896).
The exceptions were therefore properly overruled.
ON THE MERITS.
We are only concerned with the issue of landowner's right to charge for gravesites in an informally dedicated cemetery since there is no evidence suggesting that landowner has interfered or intends to interfere with the public's right to use the cemetery. We will undertake to discuss and quote from several Louisiana cases that are concerned with the rights of families of the departed as related to cemetery problems.
In the case of Choppin v. Dauphin, 48 La.Ann. 1217, 20 So. 681, 33 L.R.A. 133 (1896), the Court granted an injunction in favor of the Choppin family prohibiting the owner of a tomb (the Dauphin family) from removing the remains of four members of the Choppin family then resting in the tomb. Ownership was recognized in the Dauphin family, but it was established that Dr. Dauphin arranged for the transfer of these remains to his tomb with the understanding that the tomb should be the last resting place of the remains. The court concluded that the question was not one of title, but was rather one to be solved by other tests. Applicable here are the following quotations from that opinion:
"We appreciate that servitudes exist only for the benefit of immovable property or the profit and advantage of the living. Rev.Civ.Code, arts. 709, 653, et seq. We do not perceive any basis to sustain any right of plaintiffs (Choppin) in the nature of a servitude of burial on this tomb. We recognize, too, that the title to immovable property in Louisiana must conform to ownership and its modifications prescribed by the Code, arts. 490, 492, 533, 636, et seq.; State v. McDonogh, 8 La.Ann. 251; Succession of McCan, 48 La.Ann. 145, 19 So. 220. The title to burial ground admits of none of the modifications established for the advantage of estates or the uses of individuals. * * *" 48 La.Ann. 1217, 1219, 20 So. 681, 682.
On rehearing, the court summarized its original opinion, stating:
"The original opinion in this case maintained that cemetery lots did not part with the character of immovable property because devoted to burial purposes. Under our law whatever its uses, land is immovable. The Code completely effaces the distinction of `things holy, sacred and religious.' Civil Code arts. 452, 456; McEnery v. Pargoud, 10 La. Ann. 497; Burke v. Wall, 29 La.Ann. [38], 46. The opinion, therefore, necessarily recognizes the title of Mrs. Dauphin, the legatee of her husband, to the lots bought by him and left at his death to her.

*695 "The opinion affirmed, of course, there could be no servitude, usufruct or other modification of ownership of burial lots. There is no servitude, in the legal sense, established on property for the interment of the dead, and the usufructs of the Code are for the profit and advantage of the living. There was also the recognition, in the opinion of the prohibition in the Code enforced in our jurisprudence of every species of tenure of property except ownership in its fullest significance, and its modifications carefully prescribed by the Code. Articles 488, 490 et seq., 533 et seq., 646 et seq., (other citations omitted) * * *
"* * * This right asserted at present and for the future, is to subsist alongside of the title the Code recognizes to the property. If admitted, the right is purely of judicial creation. The asserted right carries the use of ownership applied to burial lots, but is entirely foreign to our system." 48 La.Ann. 1217, 1221 and 1222, 20 So. 681, 683.
The right under consideration there was the right to enjoin the owner of a tomb from removing bodies after having allowed the bodies to be placed there with the understanding that the tomb was to be the last resting place for these remains. The Court concluded that they
"* * * were, therefore, confronted in our consideration of this case with the legal title to this property in the defendant, and another species of interest or form of title claimed to have been brought into existence by the declarations and conduct of Dr. Dauphin in his lifetime, but not within the recognition of the Code." 48 La.Ann. 1217, 1222, 20 So. 683.
While the Court did not specifically recognize a new property right, it was concluded that, "irrespective of any issue of title, neither Dr. Dauphin in life or his legatee after his death could recall that promise, and require the removal of remains deposited on the faith of this pledge of final sepulture." 48 La.Ann. 1217, 1222, 20 So. 683.
We understand this decision to recognize title in one party (the Dauphins) and rights of final sepulture in the other party. It was not held that the owner lost title to the property by virtue of his gratuitous grant to the Choppin family.
In Humphreys v. Bennett Oil Corporation, 195 La. 531, 197 So. 222 (1940), damages were allowed to persons whose near relatives were buried in a cemetery, for mental anguish resulting from defendants disturbing and desecrating the graves by drilling an oil well in the graveyard. The defense contended that the cemetery was never dedicated by the owner of the land to be used for cemetery purposes. The Court concluded that the formal dedication of the tract to a religious group granting "the right of occupancy for church and cemetery purposes" did not divest the owner of "fee title," and that the only intention was to give the church supervision and control of the use of the ground for those purposes. 197 So. 222 at 226.
In Humphreys, the Court in discussing the Choppin decision stated:
"* * * The case is in point, because the court there recognized the rule which prevails in other jurisdictions that, when once real estate is set apart and used for a final resting place of the dead, the owner cannot thereafter make another use of it inconsistent with that to which it was devoted. And it was held also that, while the plaintiffs had no `ownership' in the tomb in a strict legal sense, yet they did have `another species of interest or form of title * * * not within the recognition of the Code'.
"So, in the case at bar, while plaintiffs do not own, in a strict legal sense, an interest in the cemetery, they do have a `species of interest or form of title' therein." 197 So. 222, 228.
So again we find recognition of "rights" held by the families of those buried in the cemetery. But it was not held that "fee *696 title" to the cemetery property was lost by the owner, even though the property had been formally dedicated.
It is also noted that plaintiffs in Humphreys "buried their relatives there under permits". The permits were granted by church authorities, rather than the "fee title" owners, but there the "fee title" owner had specifically assigned the property for church and cemetery purposes to the church authorities. This is not to be likened, as plaintiff here contends, to an abandonment of the property such that no authority or control can be exercised over the cemetery property.
In Thomas v. Mobley, 118 So.2d 476 (La. App. 1st Cir. 1960), damages were sought alleging facts similar to Humphreys except that there was no formal dedication of the property as a cemetery. Instead the tract had been used for burial purposes, as we have in the instant case, for approximately one hundred years. Plaintiff's claim for damages was denied when plaintiffs failed to prove desecration of the graves. Instead it was established that defendant's operations were conducted with care and did not disturb the surface of the burial grounds nor did the operations destroy any graves. The Court stated:
"As to the applicable law, it is conceded that, regardless of the title to the land itself, when a plot of ground is set apart and used for cemetery purposes, it becomes dedicated to use for such purposes; and that the descendants and near relatives of those interred therein are entitled to damages for profanation of these sacred grounds, as well as to injunctive relief to protect the graves and their burial and visitation rights related thereto. Humphreys v. Bennett Oil Corporation, 195 La. 531, 197 So. 222; 14 C.J.S. Cemeteries § 28, p. 87, § 29, p. 88, § 31, p. 91, § 36, p. 95; 10 Am.Jur. `Cemeteries' S. 6 (p. 489), S. 8 (p. 491), S. 29 (p. 507), S. 34 (p. 510), § 38 (p. 514). * * *" 118 So.2d 476, 478.
In Locke v. Lester, 78 So.2d 14 (La.App. 2nd Cir. 1955), plaintiffs sought to determine the boundary between a cemetery and the neighboring landowner. Landowner contended that the cemetery had never been properly dedicated, but the record showed that for over fifty years there had been no restrictions or conditions imposed upon the right of anyone to be buried in the cemetery, and it was informally dedicated to the public. The Court stated:
"We are of the opinion the reservation of said tract of land for use by the public as a burial ground or cemetery and its continuous use by the general public since it was set apart as a burial ground, is legally sufficient to dedicate said property for public use. In Humphreys v. Bennett Oil Corporation, 1940, 195 La. 531, 197 So. 222, 227, where under consideration was a plot of ground which had been transferred to a church for church and cemetery purposes, the court held that by making herself a party to the deed the vendor showed unmistakably an intention to set the lot apart for church and cemetery purposes to be devoted and consecrated to those purposes only. In the opinion Justice Odom said:
`It is our opinion, and we hold, that the dedication of this plot of ground for cemetery purposes was complete, and, since plaintiffs relied in good faith on the dedication made by the owners of the land and buried their relatives there under permits, it follows that they acquired rights therein which could not be divested by any subsequent disposition made of the property either by the fee owners or the churches, or both.
`The one-acre plot of ground having been set apart for a cemetery and its use for that purpose having been accepted by these plaintiffs and many others, neither the fee owners nor the churches could later use, or empower another to use, it for any purpose inconsistent with the use for which it was dedicated. * * *'
"Where the intent of the transferor has been to abandon certain property for public *697 use and the property is used by the general public, the dedication thereof will be regarded as complete without necessity of formal acceptance by a public or quasi public corporation. (Citations omitted)
"A parcel of land or property dedicated for use by the general public as a cemetery and which continues to serve that public purpose, is classified as a public thing under provisions of the LSA-Civil Code, and as such it is not susceptible of ownership, cannot be alienated and is not subject to prescription. LSA-Civil Code Articles 453, 454, 458, 481, 482 and 483. (other Citations omitted.) * * *" 78 So.2d 14, 15, 16.
"* * * the Marthaville Cemetery is and has been for more than half a century property dedicated to public use, and as such has become a public thing, which is not susceptible to any form of alienation whether it be in the form of estoppel, prescription or otherwise. * * *" 78 So.2d 14, 17.
These quotations lend comfort to plaintiffs' claim. However, the court was there considering a boundary dispute. If the instant case was concerned with the rights of the landowner to move the fence so as to reduce the size of "Te Mamou Cemetery", we agree that the holding of Locke, would sustain plaintiffs' demand. But the quoted language was not used in relation to the res nova problem presently before us, i. e. when property is informally dedicated to cemetery purposes, does this property thereafter belong to the public and has the landowner lost control of the cemetery tract?
If this question is answered in the affirmative, then chaos must surely follow. While the jurisprudence has established that families of those buried, will have a remedy in damages for desecration of the graves (Humphreys v. Bennett Oil Corporation, supra; Thomas v. Mobley, supra; Mailhos v. Osbon, 201 So.2d 108 [La.App. 1st Cir. 1967]), that the remains of the buried cannot be removed (Choppin v. Dauphin, supra), and that the cemetery cannot be reduced in size (Locke v. Lester, supra), the families of those buried in the cemetery would be faced with insurmountable problems if the cemetery literally belongs to the public. For example: Could a family reserve space for the immediate members of a family, or would occupancy be strictly on a first come first served basis? Could anyone bury in the lanes traditionally reserved for passageways? Most cemeteries have burial plots laid out in the same direction. What remedy would exist should someone decide to change this direction? Could a commercial mausoleum be built on some choice site in the cemetery? Could a family build its own mausoleum for future occupancy? Would a tombstone serve to hold space for a wife to be buried beside her husband?
After considering these problems and the jurisprudence discussed hereinabove, we are of the opinion that the "Te Mamou Cemetery" was dedicated for cemetery purposes by virtue of the long and exclusive usage of this property for these purposes.
This dedication is in the nature of an irrevocable covenant running with the land. It is a real right, not a servitude or usufruct, but an implied contractual relationship that binds the owner irrevocably.
The owner is bound to the following: (1) He cannot remove or disturb any grave. (2) Relatives and friends have unrestricted rights to visit and care for the graves. (3) Property included in the cemetery cannot be used by the owner for any purpose inconsistent with cemetery purposes. (4) The owner cannot reduce the size of the lands set apart as a cemetery.
On the other hand, the owner retains ownership of the land, and he may: (1) Charge for the lots or he may donate the lots. (2) Make and enforce regulations as to where burial plots will be placed. (3) Make and enforce regulations as to how burial shall be made so long as those regulations *698 are consistent with the manner in which burials have been accomplished in that cemetery.
For these reasons, the judgment of the trial court is reversed. All costs are to be paid by plaintiff-appellee.
Reversed and rendered.
FRUGE, J., recused.
TATE, Judge (concurring in part, dissenting in part).
The writer concurs in the majority's excellent and scholarly analysis of the jurisprudence. The writer also agrees with the majority's conclusion that a public cemetery, by dedication, results in retention of the naked title by the record owners, subject to an irrevocable dedication for public cemetery use.
What I disagree with is the majority's subsequent conclusion, unsupported by the jurisprudence or by custom, that the record owner must necessarily also retain the right to charge for new burials and to regulate the running of the public cemetery. This conclusion is founded on the naked assumption that otherwise chaos must result; but the assumption is contradicted by one hundred and fifty years of history.
Public cemeteries such as the present are a frontier social institution. They recognize a species of real right not founded on legislation but instead upon judicial recognition of burial rights created by the custom of the New World. The present cemetery, as well as (according to the evidence) two others in the area, as well as countless others throughout the State, have in practice worked well by mutual, or at least majority, consent of those owning in indivision, i. e., the families of those buried therein.
The present cemetery, for instance, is over one hundred years old (except for a 65-foot strip added to the rear by the present landowner's father). By custom from time immemorial, the families gather on All Saints Day, clean the tombs, and in a meeting take up a collection and elect (usually re-elect) a caretaker who handles the details of month-to-month management, slight as they are. Each family knows its own plot, the caretaker arranges for grasscutting, etc., and the cemetery runs with social coherence. Until the present landowner and his father (the latter of whom was enjoined from further attempts to collect or to disturb the rights of others in public burial), the record owners did not attempt to interfere with the burial rights of those buried in the present old cemetery.
The virtually uncontradicted evidence shows that those who owned the lands before the defendant Vidrine's family did not charge for burial rights in the public cemetery dedicated some one hundred years ago. (The dedication resulted from the notorious use of the property as a burial ground with the knowledge and acquiescence of the owner. Thomas v. Mobley, La.App. 1st Cir., 118 So.2d 476; 14 Am.Jur.2d "Cemeteries", Section 14.) As to those lands previously dedicated, the Vidrines could not, any more than could their predecessors in title, charge for new burials by those families with burial rights resulting from previous interments of members of their families.
In describing the nature of the dedication, our Supreme Court stated in Humphreys v. Bennett Oil Corporation, 195 La. 531, 197 So. 222, 227, with regard to a similar cemetery:
"The one-acre plot of ground having been set apart for a cemetery and its use for that purpose having been accepted by these plaintiffs and many others, neither the fee owners nor the churches could later use, or empower another to use, it for any purpose inconsistent with the use for which it *699 was dedicated. The Tomlinson heirs acquired the fee title to this ground by inheritance. But they acquired no greater right in the soil than their ancestors had. By setting this plot of ground apart for cemetery purposes, Dr. Tomlinson and his widow gave solemn assurances to the living that they might use it as a place for the final repose of their dead. In so doing, they reserved to themselves no other rights in the soil than such as were perfectly compatible with the free and full exercise and enjoyment of the use to which they had devoted the property. Neither could they while living, nor can their heirs now, break faith with those who relied upon such assurances. The principle of estoppel will not permit the withdrawal of such solemn promises upon which others have acted in perfect good faith." (Italics mine.)
I suggest, as did the trial court in holding contrary to the majority, that the Vidrines, by now charging for burial rights, can effectively revoke or limit what was dedicated to unrestricted cemetery use by their ancestors in title: for there is no limit to what may be charged, and the natural desire to unite families in death in a common plot can be thwarted (or taken advantage of) by excessive charges now. To permit the defendant Vidrine at this late date to start charging for new burials is, in the words of the Supreme Court, not "compatible with the free and full exercise and enjoyment" of the cemetery use to which his predecessor in title had dedicated the property a century ago. 197 So. 227.
The majority has characterized a public cemetery dedication as an "irrevocable covenant running with the land." I prefer to characterize it, in civilian terms, as a real right, Civil Code Article 487, Yiannopoulos, Civil Law of Property, Sections 84, 90 (1966), in the nature of a servitude.[1]
The real right was acquired, in this instance, by usage with the consent of the owner. Therefore, its extent, as in the case of a servitude similarly established, is determined by the extent of the usage. Civil Code Article 743; see Acadia-Vermilion Rice Irrigation Co. v. Broussard, La.App. 3d Cir., 185 So.2d 908, 911, authorities cited in footnote 1. The owner cannot make the use of the real right more burdensome he "can do nothing tending to diminish its use, or make it more inconvenient." Civil Code Article 777.
As to the front two-thirds, therefore, the present owner cannot now charge for future burials, for his ancestors dedicated it (permitted its usage) without exacting that as a condition for future burials of those families using itusing it moreover with the implied assurance that other members could later be buried in their plots or nearby without onerous conditions.
I therefore dissent from the majority opinion insofar as it now permits the present owner to charge for new burials. Over a century ago this land was dedicated by his predecessor in title for use as a public cemetery available for families buried therein without charge or right to disrupt their use of ancient burial plots.
The rear 65 feet, however, is in a different category. The defendant's father just 18-20 years ago moved the fence back to include this rear strip. He and his son have consistently charged for the new burials since held in this new strip. The new portion was thus dedicated for cemetery *700 use subject to the right of the owners to charge for new burials and for the use of new burial plots. I concur with the majority's modification of the trial court judgment insofar as this rear strip.
In concluding, I dissent with great respect from the majority's practical and commonsensical disposition of a difficult question. I do so also with the knowledge that these country cemeteries are a dying social institution, being displaced by the formally organized church and paid-upkeep cemeteries, and that probably no great harm is done, taking a long view of the future. Nevertheless, I do not believe it to be the place of this tribunal to give the coup-degrace to the country cemetery, this ancient institution of our society, which until now has been protected by the courts. I do not think we should defeat the justified expectations of the families with loved ones buried in these old cemeteries that their rights of future burials could not be hampered or prevented by the record title owner of the land, whose ancestors had previously dedicated it to unrestricted public cemetery use.
Like the trial court, I would follow the unbroken line of judicial decisions from our past, and I do not believe we should take it upon ourselves to reform an untidy institution and thus deprive the owners of this real right of their unhampered burial rights, as sanctioned by decades and decades of usage.
I therefore respectfully dissent in part from this reversal of our trial brother.

On Application for Rehearing.
En Banc. Rehearing denied.
TATE, J., is of the opinion that a partial rehearing should be granted for the reason stated in his dissent to the original opinion.
FRUGE, J., recused.
NOTES
[1] Technically, the real right could not be a predial servitude, since it is owed to persons (the families of those buried there), whereas a predial servitude is owed by one estate to another. Civil Code Article 647. It could not be a personal servitude either, for the latter terminates with the life of the person in whose favor it exists. Civil Code Article 646. However, as in the case of mineral real rights, it is a judicially created real right in the nature of a servitude, with many of the letter's characteristics, although not within the code definition since owed to persons and not to other estates.