186 So. 342

JILES et al. v. VENUS COMMUNITY
CENTER BENEV. MUT.
AID ASS'N.

No. 33859.

Jan. 10, 1939.

Rehearing Denied Feb. 6, 1939.

Robert A. Ainsworth, Jr., of New Orleans, for appellant.

James Wilkinson, of New Orleans, for appellee.

ROGERS, Justice.

Israel Jiles and his wife, Ruby Jiles, appeal from a judgment rejecting their suit to recover $3,000 each from the Venus Community Center Benevolent Mutual Aid Association for an alleged breach of contract.

The defendant is a corporation engaged in the business of providing doctors, medicines, weekly relief and burial to its members. The by-laws of the defendant association provide for two classes of membership, namely, juvenile members from one month to fifteen years, and adult members from sixteen years to fifty years. On payment of dues at the rate of 5 cents a week, juvenile members are entitled to doctors, medicines and burial when in need thereof.

On February 25, 1933, a female child, named Octavia Jiles, was born of the marriage of Israel Jiles and Ruby Jiles. On August 28, 1933, upon the application of Ruby Jiles, her mother, Octavia Jiles was made a member of the defendant association, entitling her to doctors, medicines and burial on payment of dues at the rate of 5 cents a week. In the certificate of membership issued by the defendant association, Ruby Jiles was designated as the beneficiary.

The plaintiffs allege that the infant, Octavia Jiles, became ill on Tuesday, April 24, 1934, and that, availing themselves of the provisions of the certificate of membership issued to Octavia Jiles, a physician, employed by the defendant for the purpose, was summoned to the home of the plaintiffs where he attended the child and prescribed medicine for her use; that on the following day, Wednesday, April 25, 1934, the condition of the child was somewhat improved and further medical attention was neither asked for nor received, the plaintiff, Ruby Jiles, keeping close touch on the child and personally ministering to her needs; that on the morning of Thursday, April 26, 1934, observing that the child was feverish, Ruby Jiles summoned the physician of the defendant association but he did not respond to the call, and noting that the child was worse, Ruby Jiles again summoned the physician in the afternoon; that while awaiting the arrival of the physician, who was expected at any moment, Ruby Jiles did everything within her power to relieve the condition of the child; that, in the evening of the same day, the physician of the defendant who had been summoned by the two previous telephone calls not having appeared, the plaintiffs sent a messenger to the office of the defendant association, which messenger personally communicated with the president of the association who was informed of the severe illness of the child and the fact that the doctor had failed to put in his appearance, and that the president promised the physician would be sent immediately; that about 11 o'clock P. M., on April 26, 1934, the physician of the defendant association, who had been summoned that day in the

morning, in the afternoon and in the evening, not having appeared, and the condition of the child having grown constantly worse, plaintiffs hurriedly carried her to the Charity Hospital of New Orleans where it was found she was in such a weak condition that she probably would not live; that on the following day, April 27, 1934, at about noon, the child died, the cause of death being given as acute gastroenteritis, dehydration, dysentery, and bronchopneumonia.

Plaintiffs allege that if the physician of the defendant association had arrived when summoned the condition of the child, to which reference is made, could have been arrested in its early stages and the child would not have died. They claim damages for the pain and suffering of their child and for the mental anguish and loss of her companionship.

The defense, as set forth in the answer, is substantially that at no time on Thursday, April 26, 1934, did the plaintiffs call the physician of the defendant association, nor did they take the necessary steps to notify the defendant that their child needed the services of a physician.

The court below dismissed plaintiffs' suit on the ground that "the facts developed in this case show that the defendant has complied with all the obligations imposed on it by its contract."

The testimony concerning the summoning of the physician of the defendant association on April 26, 1934, is conflicting. We think, however, from our examination

of the record that the conflict must be resolved in favor of the plaintiffs.

Three witnesses were produced by plaintiffs in support of their allegations relative to the summoning of the physician. The first witness Pearl Ramsey is a sister of the plaintiff, Ruby Jiles. Her testimony is that she telephoned for the doctor at 9:30 o'clock in the morning of Thursday, April 26, 1934, the day before the child, Octavia Jiles, died. She states that she used the telephone of Mrs. Joseph, who resides across the street from the plaintiffs, and that Mrs. Joseph was present when she called the telephone number of the office of the defendant association. She further testified that at 3:30 o'clock in the afternoon of the same day she made another call by telephone to the office of the defendant association, again using the telephone of Mrs. Joseph, and that Mrs. Joseph was also present when this call was made. The witness states, with reference to these telephone calls, that:

"When I rang I asked for the doctor to be sent to 1361 Columbus Street (which was the residence of the plaintiffs) and they told me why did I not call earlier for the doctor just went in that neighborhood and asked me if the child was seriously sick and I told them 'Yes' and they told me the doctor would be there. So the doctor never did come at all and in the evening at 3:30 I called back again and a woman answered me at that time and I told her the doctor never came to the address of Octavia Jiles and the child was seriously sick. She said 'The child was seriously sick'? and I said 'Yes' and we still waited

on the doctor. She said the doctor will be out there."

Pearl Ramsey is corroborated by Mrs. Joseph at whose home the calls were made. This witness remembers the times, namely, 9:30 o'clock, A. M., and 3:30 o'clock, P. M., at which the calls were made to the office of the defendant association for the doctor. The third witness to the summoning of the physician of the defendant association on April 26, 1934, is Lionel Boswell, the thirteen year old brother of the plaintiff, Ruby Jiles. His testimony is that about 7 o'clock in the evening he was sent by his sister to the office of the defendant association; that he saw Labat, the president of the association, and told him his sister wanted to know why the doctor had not come and that he was told by Labat the doctor would be there right away.

On behalf of the defendant association, Labat, its president, testified that the boy Lionel Boswell never called at the defendant's office on Thursday night but called there twice on Tuesday—the first time, in the afternoon to ask that the doctor be sent, which was done, and the second time, the same night to get medicines. Lucille Fernandez, a young woman employed in the office of the defendant association, testified that she never received any telephone message whatever on Thursday, April 26, 1934, that the child Octavia Jiles was sick and requesting that a doctor be sent to attend her.

It is argued on behalf of the defendant that the testimony of Pearl Ramsey is improbable and untrue. We do not think so.

Nothing could be more probable than that Ruby Jiles, the mother of Octavia Jiles, attempted to obtain the services of a physician on Thursday, April 26, 1934, when her child became so ill, and it was perfectly natural for her to seek to obtain the services of the same physician who attended the child on the 24th of April, 1934, and to do so in the same way, through the office of the defendant association. The premium receipt book provides that, among other places, the doctor of the association may be called at 808 N. Claiborne Avenue, telephone No. Main 9054, where such calls were usually taken down on slips of paper and given to the association's doctors. We are therefore convinced that the testimony of Pearl Ramsey, which is corroborated by Mrs. Joseph, a disinterested witness, is true—that on Thursday, April 26th, she telephoned twice to the office of the defendant association requesting that a doctor be sent to attend the child Octavia Jiles.

We think Labat is mistaken in his statement that Lionel Boswell called at the association twice on Tuesday and not at all on the following Thursday. As we have shown, the statement is directly contradicted by Lionel Boswell, and Ruby Jiles herself testified that when her child first became sick, which was on Tuesday, April 24, 1934, she went over to Mrs. Joseph's and called up the doctor. This was the first call for the doctor, and Labat admitted that the first call notifying him that Octavia Jiles was sick came over the telephone in the afternoon. In response thereto, he in turn telephoned the doctor and asked him to call at the home of the Jiles and give them service. The doctor testified

that upon receiving the call from Labat, he visited the child; that it was pretty close to closing time "because I called up and asked them to wait as I was going down to make the call in order that we could buy the medicine right there and get it back." The doctor further testified that after seeing the child, he brought a boy (Lionel Boswell) back to the dispensary, which was maintained at the office of the association, and had the prescription filled and that the boy returned with it.

The record further discloses that on the morning of Thursday, April 26, 1934, one John Dacoo, whose sister was apparently the collector of the association, was given 15 cents by Ruby Jiles to pay the weekly dues for the account of Octavia Jiles; that Dacoo visited the office of the defendant association at 808 N. Claiborne Avenue twice—the first time, about 9:30 o'clock in the morning, and the second time, about 10:30 o'clock in the morning. On the occasion of the first visit, he asked for his sister who was not in the office, and on the second visit, he gave the 15 cents to Labat who entered the payment on the receipt book held by the Jiles. At the time Dacoo paid the money for account of the Jiles he told Labat that the child was sick and they wanted the doctor. Labat admits this and states that he informed Dacoo that he did not know where to locate the doctor and to tell them to call the doctor themselves. Thereafter Labat apparently gave himself no concern about the matter. Although he saw the doctor that afternoon, he did not tell him about the child. His excuse for not doing so was that he had his business to attend to; that it was a busy day and he did not give the doctor any message.

The doctor testified he did not receive any message from anybody on Thursday, April 26, 1934, that the child was not doing well and needed his services; that if he had received such a message he would have given the matter prompt attention.

We think the testimony shows that the defendant association breached its contract to furnish a doctor's services to the plaintiffs' child and that they are liable for damages to plaintiffs for such breach.

Since the medical testimony in the record is to the effect that it is not certain the child Octavia Jiles would have lived if she had received the services of a physician on the day preceding her death, the only sustainable ground of recovery alleged by plaintiffs is for mental anguish. We think the existence of mental anguish by parents because of the serious illness of a child may be conceded. This is particularly the case where they are unable to furnish the child with the proper medical attention. Under their contract with the defendant, plaintiffs were entitled to the services of a physician for their sick child. We are satisfied that defendant's default on its obligation, compelling plaintiffs, because of the increased severity of her illness, to carry the child to the Charity Hospital at 10:30 o'clock at night, not only resulted in depriving plaintiffs of a legal right but also in the infliction of pain and suffering upon them.

In this State, mental anguish is recognized as a distinct element of dam-

ages and not merely an incident to be taken into consideration in addition to pecuniary loss. Such damages are considered as actual or compensatory. Graham v. Western Union Telegraph Co., 109 La. 1069, 34 So. 91; Lewis v. Holmes, 109 La. 1030, 34 So. 66, 61 L.R.A. 274. There are no set rules by which the amount of such an award can be gauged. Each case must be controlled by its own peculiar facts and circumstances. In this case, we think an award of $350 will do full justice between the parties.

For the reasons assigned, the judgment appealed from is annulled, and it is now ordered that there be judgment in favor of the plaintiffs, Israel Jiles and Ruby Jiles, and against the defendant, Venus Community Center Benevolent Mutual Aid Association, in the full sum of $350; all costs to be paid by the defendant.