243 So.2d 820 (1971)
Harrell E. GULLATT, Plaintiff-Appellee,
v.
ASHLAND OIL & REFINING COMPANY et al., Defendants-Appellants.
No. 11568.
Court of Appeal of Louisiana, Second Circuit.
February 2, 1971.
*821 Goff & Goff by A. K. Goff, Jr., Ruston, for plaintiff-appellee, Harrell E. Gullatt.
Theus, Grisham, Davis, Leigh & Brown, by J. C. Theus, Monroe, for defendants-appellants, Ashland Oil & Refining Co., The Travelers Ins. Co., and A. A. Gilbert Pipe & Supply Co.
Meadors, Atkins & Meadors by William F. M. Meadors, Jr., Homer, for defendant-appellant, E. A. Hinton Well Servicing, Inc.
Before AYRES, PRICE and HALL, JJ.
HALL, Judge.
In this suit plaintiff seeks damages allegedly caused to his water well by the action of the defendants in setting off a charge of explosives in the removal of tubing from an abandoned gas well located on property near plaintiff's residence in Lincoln Parish. Defendants are (1) Ashland Oil & Refining Company, mineral lessee of the land on which the gas well was located and owner of the well, (2) A. A. Gilbert Pipe & Supply Company, to whom Ashland sold the tubing and casing and contracted with for the removal thereof, (3) E. A. Hinton Well Servicing, Inc., subcontractor of Gilbert, and (4) The Travelers Insurance Company, liability insurer of Gilbert. Judgment was rendered in the district court in favor of plaintiff and against the defendants in solido, in the sum of $1,347.00, representing damages to the well itself, and in the sum of $300.00, for plaintiff's inconvenience, trouble, expense, mental anguish and other elements of damage. From this judgment defendants have appealed.
Plaintiff contends that on June 14, 1966, employees of Hinton set off a charge of dynamite within the abandoned gas well in order to loosen or sever the tubing so that it could be removed. Plaintiff further contends that on this same date his water well, situated approximately 570 feet from the gas well location, suddenly ceased to produce water. It is contended by plaintiff that the explosion damaged his well, causing it to go dry and that defendants are liable for his damages. Defendants contend that the explosion did not and could not have had any effect whatsoever on plaintiff's water well.
The primary question to be resolved in this case is whether plaintiff proved by a preponderance of the evidence that the cessation of the production of water from his water well was caused by the dynamite charge set off by defendants. If there is liability on the part of the defendants, then the next question to be determined is the amount of damages to which plaintiff is entitled. A third question to be determined, in the event of liability, is whether all defendants are liable in solido.
It is our opinion that the threshold issue of causal connection between the defendants' operations and the damage to the water well was correctly resolved by the trial judge, whose careful analysis of the evidence and reasons for judgment are set forth in a detailed, written opinion.
In 1953, plaintiff had a water well drilled for him by A. E. Barrown, terminating in a prolific water sand known as the Sparta sand. The well was constructed by drilling a 4½ inch hole to a depth of 407 feet and then inserting a 2 inch pipe inside the hole with a 10 foot screen or strainer at the lower end of the pipe in the bottom of the well through which screen the water entered the pipe. Although the water sand is located at the bottom of the well, the water rose in the well to a point 220 feet below the surface and a foot valve was mounted at 260 feet below the surface or 40 feet below the water level. The electric motor which operated the pump was placed on the surface of the ground. Substantial evidence was offered to show that the well had given good service and an abundance *822 of water from the time it was completed in 1953, until the evening of June 14, 1966, when it suddenly and abruptly ceased to provide any water at all.
Ashland Oil & Refining Company was the owner and operator of the J. J. Causey Estate gas distillate well that had been drilled 570 feet from the plaintiff's water well. The Causey gas well had ceased to produce and was being abandoned. Ashland sold the tubing and casing in the well to A. A. Gilbert Pipe & Supply Company and Gilbert in turn contracted with E. A. Hinton Well Servicing Company, Inc., to pull the tubing and casing from the well.
The evidence establishes that the operations of Hinton to pull the tubing and casing in the gas well began on June 13, 1966. A crew moved in, set up their rig, bled the abandoned well of any built up gas pressure and began an attempt to pull the tubing. It was determined that the tubing could not be pulled and that there was an obstruction in the tubing located at a depth of about 7,200 feet. A decision was made to shoot a charge of dynamite inside the tubing at that depth in order to sever and free the tubing so that it could be pulled. J. D. Devore, Hinton's man in charge of blasting, came to the well site, prepared a charge of approximately 3/4 of a stick (about 1 pound) of dynamite, packed it in a container, lowered it to 7,200 feet on a wire, released a "go devil" down the wire and effected the explosion of the dynamite at that depth, severing the tubing. The well casing and tubing were packed with water prior to setting off the charge. The charge was set off some time during the afternoon of June 14, 1966.
Plaintiff and his family returned to their home on June 14, at about 4:30 or 5:00 p. m. Supper was prepared and the dishes washed. After supper one of their children had taken a bath and Mrs. Gullatt started to bathe also, when the water pressure suddenly gave way and there was no water. The water well had an 82 gallon storage tank capable of supplying such water as may have been used by the Gullatt family between the time of their arrival at their home and the time that the water ceased to flow after supper.
Mr. Barron, who had originally drilled the water well, was called but he was no longer in the water well business and suggested that someone else be called. Mr. Masters, a water well contractor, came to the Gullatt residence. Upon inspection it was determined that the pump was in good working order, but that no water was present at the 260 foot level.
After the well failure, plaintiff was advised by the water well contractors that because of the improbability of saving the old well, the better course would be to drill an entirely new well. He advertised for bids and accepted the bid of John M. Fielder to drill and install a new 4 inch well. The well was drilled to 400 feet and equipped with a new and different type motor and pump. It required 3 or 4 days to drill and place the new well into operation. The well had a static water level of 264 feet below the surface. It was capable of producing about 15 gallons of water per minute whereas the old well had been capable of producing about 6 gallons per minute. The new well was completed and placed in use on July 27, 1966.
There is considerable variance in the testimony of the witnesses in their descriptions of the nature of the explosion as observed by them from the surface. Mrs. Herman Willis, a neighbor of plaintiff who lives about 589 feet from the gas well, testified that on the afternoon of June 14, she was in her bedroom when she heard an explosion, that the ground and the house shook and vibrated and that the shaking and rumbling were prolonged. Mr. Claude O. Nelson, another neighbor, testified that he was standing in the driveway of his residence watching the work going on at the well and that he heard a roar to "dumb" sound and felt the ground quiver just a little. He saw mist or water about 12 or 14 feet high at the well. He described the *823 noise he heard as a rumbling noisea coarse sound. He was standing about 2,300 fee from the Causey well.
All six of the Hinton crew members present on June 14, testified on behalf of defendants. All of the crew members except one testified that when the detonation took place, they heard no noise and felt no concussion or jarring. One of the crew members testified that if you were listening for it you could hear a small sound and feel a little jar or tremor. It should be noted, however, that all of the crew members moved to a distance of about 100 feet from the well at the time of the detonation.
Plaintiff and defendants both presented expert testimony. Testifying for plaintiff was Mr. Robert J. Moffatt, a geologist from Shreveport with seismographic experience and limited ballistic experience gained while in the service. Mr. Moffatt testified that a detonation below the earth's surface set up a reaction much like an earthquake, with vibrations extending out in all directions from the point of the explosion. It was his opinion that the most likely and logical effect of the blast in this instance was to cause the shallower beds or strata made of clays and shales, that are not particularly stable, to crumble or slough or fall. It was his conclusion that in this instance, the overlying shales and clays were disturbed and fell down around the screen so as to shut off the influx of the water. He testified that the Sparta sand in this area is an excellant water sand that is not subject to depletion rapidly from natural or normal causes.
Testifying for defendants through written interrogatories and cross interrogatories was Mr. Anthony J. Petro, a member of the engineering firm of Vibra-Tech Engineers, Inc., of Hazleton, Pennsylvania, a consulting firm in the field of blast vibrations, with considerable experience in recording and analyzing vibrations and sound from blasting. It was his opinion that a blast of this size at this depth and at this distance from the water well, could not possibly have in any way affected the water well and resulted in its ceasing to operate. He testified that the resulting vibration at the water well location caused by the detonation of the dynamite would be in the range of what is commonly known as microseisms which can only be detected by very high magnification instruments. He stated that in his opinion only two things could have occurred to stop the water well from operating, that is, either the water table receded and finally fell below the lowest point of the rods on the day the well ceased to operate or, the clay sides of the well sloughed off over a period of time settling to the bottom and finally compacting around the screen at the bottom of the pipe cutting off the supply of water, which would have been a gradual process, with the final sealing being coincidental with the blast on June 14.
Mr. Barron, who drilled the original well, Mr. Masters, who looked at the well and tested it after it went dry on June 14, and Mr. Fielder, who drilled the new well, all experienced water well contractors of the area, each testified that they had never heard of a water well producing from the Sparta sand ceasing to produce suddenly as did the well in this case. They testified that in their experience when a well goes dry because of a lowering of the water table or because of the strainer becoming stopped up, the well will decrease in efficiency gradually over a period of time until it finally ceases to produce water. They each testified that in their opinion, plaintiff's well had ceased to produce because the screen at the bottom of the well was clogged or blocked by sands and clays from the upper stratum. The essence of the water well contractors' testimony was that something out of the ordinary must have happened and that the well would not have suddenly gone dry from normal or usual causes.
*824 It is our opinion that the trial judge correctly evaluated the evidence. In his Reasons for Judgment, he concluded:
"All of the witnesses on both sides have impressed the Court as being upright, honorable and truthful people. Yet, something is wrong in this case. On the one hand, we have no doubt but that the plaintiff's neighbors, good people, honestly testified that they heard and felt an explosion at the Causey well site in the afternoon on June 14, 1966. We certainly are satisfied that they saw some evidence of an explosion (or maybe it was the bleeding of the gas pressure) at said well. There is no doubt but that Mr. Gullatt had a good water well, producing ample water, prior to June 14, but that on said date it suddenly ceased to produce. We believe the well drilling experts that such a cessation of water production comes from some outside source, and not from a lowering of the water table.
"On the other side, we believe that the Hinton Well Service employees moved to the site of the Causey well on June 13, 1966; that they blasted the tubing in two the afternoon of June 14, 1966, using 3/4ths stick dynamite and that, so far as they were concerned, there was no loud report or jarring of the earth by the explosion, it being noted, however that all of them moved away from the well when the explosion went off. But something happened to Mr. Gullatt's well, and it happened just after the explosion set off by defendants which severed the tubing in the Causey well.
"We have, in the record, the testimony of Mr. Anthony J. Petro, a ballistics expert from New York, saying it was impossible for a blast of 3/4ths stick of dynamite 7200 feet underground to affect a water well 407 feet deep located 507 feet from the Causey well. On the other hand, we have the testimony of Mr. Robert J. Moffatt, a geologist who has had ballistic experience, who says that such an explosion could and probably did cause any unstable soil adjacent to the water well core hole to sluff off, fall down beside the 2-inch water well casing, and come to rest at the screen, so as to stop it up and cut off the flow of water. The whole seismograph operation of oil and gas operators is undertaken on the assumption that an explosion does cause shock waves and vibrations which can be recorded and we know of no reason why such vibrations from the explosion or explosions set off in the Causey well might not have shaken loose any unstable soil and shale and caused the final degree of clogging to the water well screen. The chance of the clogging of the screen happening coincidentally with the explosion is too remote to believe that this was what happened, and we are convinced that the explosion and the vibrations therefrom constituted the `straw that broke the camel's back', and completed the clogging of the water well. We have concluded that the evidence establishes, to our own satisfaction, that defendants are legally responsible for the cutting off of the supply of water in the Gullatt well."
The evidence establishes that plaintiff's well was in good condition and producing ample water immediately prior to defendants' blasting operations, that the blasting did in fact take place on the date the well went dry and that the well suddenly ceased to produce any water immediately following the blasting. Strong support is given to plaintiff's case by the testimony of the water well contractors that they never heard of good Sparta sand wells suddenly going dry from normal causes and that something out of the ordinary must have happened. Further support is given by the expert testimony of Mr. Moffatt, who was familiar with and studied the strata present in this area.
In evaluating the scientific testimony of defendants' expert, Mr. Petro, we are guided by the decision of this Court in Pate v.
*825 Western Geophysical Company of America, La.App., 91 So.2d 431 (2nd Cir. 1956). In Pate, plaintiff sought recovery for damages to a building and water well allegedly caused by defendant's seismic operations consisting of exploding charges of high explosives of 15 to 20 pounds each, within 2,900 feet of plaintiff's building. The Court, in holding that the damages were caused by defendant's operations, dealt with defendant's expert testimony as follows:
"The defense is based almost exclusively upon expert testimony given by one Dr. Louis Don Leet, no doubt an outstanding authority with respect to seismic operations and phenomena, who was most positive in this opinion that plaintiffs' damages did not result from defendant's operations. From his study of the location of the various shots complained of and from his mathematical calculations and computations, he stated there could not have been enough force from any of them to have damaged either of those structures, referring to plaintiffs' buildings, or the wells. The force and effect of the Doctor's testimony is considerably minimized by the very purpose for which the explosions were made. As explained by him, the purpose of these geophysical operations through the explosive method is to set in motion vibrations in the earth, which vibrations, on reaching masses of rock or other substances, are rebounded and recorded upon instruments on the earth's surface for use in the study and determination of the character, depth and substance of the formations beneath the earth's surface. If these charges are of sufficient intensity and force so as to penetrate deeply into the earth and rebound to the surface, it would appear inconsistent that such explosions could not and would not produce vibrations horizontally. The effect of Dr. Leet's most informative and learned scientific explanations would lead to the conclusion, which he expressed in most positive terms, that defendant's operations could not and did not cause the damages as plaintiffs alleged; but, as opposed to this scientific hypothesis, we are confronted with the fact, overwhelmingly established by the evidence, that the damages occurred immediately following defendant's operations. To ascribe this fact to sheer coincidence would be a speculative and illogical procedure. Again, while it may be said that such testimony establishes the so-called scientific impossibility of the damage resulting from the explosive operations, the fact is that the only reasonable conclusion is that such damage was caused by and is attributable to defendant's operations."
Similarly, in Fontenot v. Magnolia Petroleum Co., 227 La. 866, 80 So.2d 845 (1955), a suit for damages to residences caused by geophysical operations involving the explosion of 10 pound charges of Nitramon "S" at depths of 66 to 70 feet at distances of 860 to 1,000 feet from plaintiff's residences, the Supreme Court found a causal connection between the blasting and the damage in spite of testimony by explosive experts that such was scientifically impossible.
See also Wright v. Superior Oil Company, La.App., 138 So.2d 688 (3rd Cir. 1962) in which the court awarded plaintiff damages for injuries to his water well caused by defendant's seismograph operations in which a 2½ pound charge was detonated 795 feet distant from the water well.
We conclude that the cessation of production of water in plaintiff's water well was caused by defendant's operations at the Causey gas well.
Liability in this case does not depend upon fault or negligence, but is based on the doctrine of absolute liability, expressed in common law as "Sic utere tuo ut alienum non laedas", and codified in Louisiana law by Civil Code Article 667. Article 667 provides:
"Although a proprietor may do with his estate whatever he pleases, still he can *826 not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."
In Fontenot, cited supra, the Supreme Court held:
"In disposing of questions of this character, we are mindful of two important considerations: First, to give the owner of property the largest liberty possible, in the use, occupation and improvement of his own property, consistent with the right to employ modern methods and machinery in accomplishing the improvements desired; and second, that one may not use his own property to the injury of any legal right of another. This maxim of the common law, `Sic utere tuo ut alienum non laedas',1 is so well established
1"So use your own that you do not injure that of another."
and so universally recognized that it needs neither argument nor citation of authority in its support.2"
2 20 A.L.R.2d 1384.

* * * * * *
"It has been universally recognized that when, as here, the defendant, though without fault, is engaged in a lawful business, conducted according to modern and approved methods and with reasonable care, by such activities causes risk or peril to others, the doctrine of absolute liability is clearly applicable. There can be no legal justification for relieving it of liability and thereby deny compensatory damages to one having no relation to the conducting of such business and thus compel him to bear the unwarranted loss."

* * * * * *
"We are unwilling to follow any rule which rejects the doctrine of absolute liability in cases of this nature and prefer to base our holding on the doctrine that negligence or fault, in these instances, is not a requisite to liability, irrespective of the fact that the activities resulting in damages are conducted with assumed reasonable care and in accordance with modern and accepted methods.
"It follows that clearly the plaintiffs in this instance do not bring an action in tort but one that springs from an obligation imposed upon property owners by the operation of law thereby granting to other property owners the maximum enjoyment in the liberty and use of their property. To hold otherwise would grant the right to conduct operations of a nature as is here involved, and upon its being shown that such activities are conducted in full accord with accepted modern methods, no liability may attach therefor in favor of persons injured."
The evidence establishes that plaintiff's actual cost of drilling the new 4 inch well, fully equipped, was in excess of $2,400.00. The cost of drilling a new 2 inch well, equipped in the same manner as the old well, would have been $1,720.00. Some of the equipment from the old well, valued at. $373.00, could have been used on a new 2 inch well. The trial judge awarded plaintiff $1,347.00, which would have been plaintiff's cost for a replacement well of the same size and type as the old one. Defendants contend that the proper measure of damages for a building or structure damaged beyond repair is replacement cost less depreciation. It is contended that plaintiff's well could have been expected to produce between 10 and 30 years, that a fair depreciation would be 50%, and that the award should be reduced to $673.50.
The proper measure of damages where property has been destroyed beyond repair is replacement cost less depreciation, when there is no evidence as to the value of the property prior to and after the damage. Granger v. Bouillion, La.App., 220 So.2d 764 (1st Cir. 1969) and cases cited therein. Plaintiff's well was 13 years old at the time it was damaged. There is evidence in the record to the effect that water wells such as this have a life expectancy of from 10 to 40 years or more. We hold *827 that the district court's award based on replacement cost should be reduced by a reasonable depreciation factor and we believe that 1/3 is reasonable in this instance. Accordingly, the award of $1,347.00 for damage to the well itself is reduced to $898.00.
Defendants also cite as error the award of $300.00 made by the trial judge to compensate plaintiff for his "inconvenience, trouble, expense, mental anguish and other elements" of damages occasioned by his being without a serviceable well from June 14 to July 27. The record shows that plaintiff and his family were required to obtain and transport water from their neighbors and more distant sources and they undoubtedly experienced mental anguish, inconvenience and some expense by reason thereof. The trial judge's award in this respect is fully supported by the evidence and by the jurisprudence. In Fontenot, the Supreme Court held:
"We also conclude that plaintiffs are entitled to recover damages as a result of the invasion of the privacy of their respective homes, the inconvenience occasioned them and the mental anguish suffered by each as a result of these property damages. Actual damages resulting from a wrongful act are not limited to the pecuniary loss sustained thereby. They extend also to the mental and physical suffering which are considered a distinct element of damages and as such are actual and compensatory. Byrne & Co. v. Gardner & Co., 33 La. Ann. 6; Bourge v. Brownell-Drews Lumber Co., 120 La. 1009, 45 So. 972; Jiles v. Venus Community Center, etc., Ass'n, 191 La. 803, 186 So. 342; Dodd v. Glen Rose Gasoline Co., 194 La. 1, 193 So. 349, 353; Humphreys v. Bennett Oil Corporation, 195 La. 531, 197 So. 222; McGee v. Yazoo & M. V. R. Co., 206 La. 121, 19 So.2d 21. We feel that an award of $250 in that respect to each of these plaintiffs is commensurate."
The final issue presented for decision is whether all defendants are liable in solido. Counsel for defendants contends that if any defendants are liable, judgment should be rendered only against Gilbert and its insurer, Travelers. Defendants contend that the blasting operation was the sole responsibility of Gilbert, that Ashland had no connection with the operation, and that Hinton was simply following Gilbert's instructions.
In Fontenot, the Supreme Court held all defendants liable in solido under circumstances similar to those involved here. We believe the doctrine of absolute liability established by Fontenot in cases of this nature applies equally to each of the defendants in this case.
For the reasons assigned, the judgment of the district court is amended to reduce the total award to plaintiff from $1,647.00 to $1,198.00, and as amended, is affirmed.