McEnery, for the use, &c., v. H. Pargoud.

The parish of Ouachita acquired the land in controversy by an unconditional grant from the United States in 1823. In 1827, it was sold under execution to satisfy a judgment against the parish, and after several mesne conveyances came into the hands of defendant. A part of the property had been used as a cemetary between the years 1794 and 1800, but its use was then abandoned. The parish brought this suit to annul the sale, and to be re-instated in its title, on the ground that the property was inalienable. There was no proof that the land had been consecrated as a burial place, or that it had ever been dedicated either expressly or by acquiescence to any public use. *Held :* That the temporary use of the land as a burial place, did not exclude it from commerce and exempt it from sale ; and that the facts did not sustain the ground that it was a public place.

APPEAL from the District Court of Ouachita, *Richardson, J.*
    *McEnery,* for plaintiff.  *McGuire & Ray,* for defendant and appellant.

Spofford, J.  On the 1st of January, 1821, *D. J. Sutton,* Register of the U. S. Land Office for the district north of Red River, reported to the General Land Office at Washington City a list of land claims entered in his office, pursuant to the Act of Congress passed on the 11th May, 1820, entitled : " An Act supplementary to the several Acts for the adjustment of land claims in the State of Louisiana."

Claim No. 59 was reported in the following terms and classed in the second class.

" The parish of Ouachita claims a tract of land at the junction of the River Ouachita and Bayou Siard, of three arpents front on the river by five arpents deep, equal to twelve American acres and 69-100.  In this claim, *Jean Filhiol,* former Spanish commandant, deposes that he came to Ouachita as commandant in the year 1783 ; that, some time afterwards, at a general assembly of the inhabitants, it was agreed to set apart a piece of ground, *not conceded,* of the dimensions claimed, for the purpose of a grave yard, and to build a church upon ; that, therefore, a portion was enclosed for a grave yard ; that in the next year, 1794, several persons were buried there, and that the inhabitants continued to bury there *until the change of government,* and that this land was always considered as public property.  Also, *Etienne Risson* deposes that he has been an inhabitant of Ouachita for forty years ; that in the year 1793, the inhabitants (among whom he was one) were ordered by the commandant to furnish pickets and fence in this land for a grave yard, and that it was constantly used thereafter as a burying ground.  These two witnesses are worthy of credit.  This is a small piece of land, but very important to the feelings of the inhabitants."  Am. State Papers, Public Lands, vol. III, p. 603.

This claim was duly confirmed by the Act of Congress approved February 28th, 1823.  U. S. Stat. at large, vol. 3, p. 727.

In 1827, *Philip Winter* and wife, as heirs of *Wm. Collins,* brought a suit against the parish of Ouachita, which was contested, and resulted in the following definitive judgment :

" By reason of the law and evidence in this case, it is ordered, adjudged and decreed that the plaintiffs recover of the defendants, the Police Jury and the parish of Ouachita, the sum of five hundred dollars with judicial interest from the 4th day of April, 1827, until paid, with costs of suit to be taxed ; and it is further ordered, adjudged and decreed that the public property of said parish

63

McENERY
*v.*
PARGOUD.

be subject to be seized and sold to satisfy said demand as prayed for in the petition."

This judgment was signed by the District Judge on the 21st April, 1827, and no appeal appears ever to have taken from it.

Execution issued upon the judgment in July, and the property above described as having been confirmed to the parish by Act of Congress, was seized, and on the 17th August, 1827, adjudicated to *Robert C. Scott* at Sheriff's sale.

On the same day, *Scott* conveyed the land by authentic act to *Jonathan Morgan*, with warranty.

On the 17th November, 1829, *Winter*, the plaintiff, in execution, assumed the warranty of title to *Morgan* who released *Scott*, the act for this purpose being passed before the parish Judge.

On the 23d April, 1838, *Morgan* conveyed the land in question, by public act, to *Hypolite Pargoud*, the defendant in this action.

It also appears that an *alias* execution issued on the judgment of *Winter v. The Police Jury of Ouachita*, on the 24th August, 1827, to make the balance of the judgment which was not satisfied by the sale of the land in question ; other property was levied upon, but before the sale day, the Police Jury passed the following ordinance :

" Whereas *R. C. Scott* has obtained a judgment against the parish in favor of the heirs of *Wm. Collins*, for the sum of $500, for the payment of which amount some public property has already been sacrificed, and more of it likely to follow the same course, and Mr. *Scott*, as agent of said heirs, being agreed to stay execution until taxes sufficient to discharge the debt can be collected therefor : Be it ordained, that the Parish Judge be and he is hereby authorized to give said *Scott* an order on the Treasurer for the balance due on said claim, out of any moneys not otherwise appropriated. Sept. 4th, 1827."

In 1851, the parish of Ouachita, through the President of its Police Jury, instituted the present suit against *Hypolite Pargoud*, for the land in controversy, upon the allegation that by virtue of the Acts of Congress and the report of the Register *Sutton*, it was granted to the parish for the purpose of a burial ground, and that the same thereby became the public property of the said parish.

*Pargoud* pleaded his title as already described, and the prescription of ten and twenty years.; he also called the heirs of his vendor in warranty.

There was judgment for the plaintiff against *Pargoud*, and for *Pargoud* against the heirs of his warrantor. The defendants have appealed.

The case must turn upon the question of the alienability of the land at the date of the Sheriff's sale ; for if it was inalienable, it is imprescriptible. C. C. 3463.

It is not pretended that at the date alluded to, there was any special statute exempting the property from seizure.

The only grounds upon which it seems plausible to urge that the sale was null, are that the property was a thing sacred, or that it was dedicated to the public use, or that it was essential to the existence or proper administration of the parochial government.

Of these points we will treat in their order.

I.—The ancient Roman superstitution stamped every spot of earth where a human body was known to repose, with a sanctity which excluded it from com-

merce. *Institut. de rerum divisione.* Dig. L. I, tit. 3, 1. 6, § 5. L. II, tit. 6, 1. 6, § ult.

It would seem that the Spanish law assimilated itself closely to the Roman law in this particular. III Partida, tit. 28, 1. 14.

"A free man, a thing religious, sacred or holy, a public place—as public squares, roads, threshing grounds, rivers and other waters which belong to the King, or commons of any city—cannot be sold or alienated. But though we here say that a thing sacred or religious cannot be sold, yet there is a case in which it may be; as where a village or any other place is sold with all its dependencies. For though the church in the village, or anything belonging to it, could not be separately sold, yet by selling the village, they would pass with all other things, and the sale would be valid, as we have said in the first part of our book, under the title which treats of things belonging to the church, and of those that can and cannot be alienated." V Partida, tit. 5, 1. 15; 2 Moreau & Carl. Partidas, 670.

In countries where the Catholic religion prevails as the religion of the State, grounds, like cemeteries, become sacred and inalienable after being blessed by the priestly power. Merlin, Rep. verbo, Cimetière.

The evidence shows that a part of the ground in question was first used as a place of burial under the Spanish provincial government, about the year 1794. No concession of the land was ever made. The inhabitants intended to build a church there, but never consumated their intention. A small portion of it, by a sort of common consent, was enclosed with pickets by the inhabitants, and used as a cemetery for a short period, say from 1794 to 1800. It does not appear whether it was ever consecrated. Its use was then abandoned, another spot having been selected for a grave yard which was thought to be more convenient.

In 1803, the country embracing it was ceded to the United States, and in 1823, this land was confirmed to the parish of Ouachita by Congress, moved, it would seem, by a respect for the feelings and associations of the old inhabitants of the neighborhood. But the United States annexed no condition to its grant. The fee simple of the land passed absolutely to the parish, and it must thenceforward be considered as under the dominion of the laws of Louisiana.

Conceding that by the Spanish law the mere fact of the ground having been used for the interment of the dead made it sacred ground, and therefore inalienable, the adoption of the Code of 1825 obliterated that distinction. "The provisions of the ancient laws concerning the distinction of things into holy, sacred and religious, and the nature and inalienability of these kinds of things, are abolished; and nothing prevents the corporations or congregations to which these things belong, from alienating them, provided it be done in the manner and under the restrictions prescribed by their acts of incorporation." C. C. 447.

II.—The plaintiff zealously urges that the property was a public place, and therefore inalienable. If by the term public place it is meant that the property once belonged to the parish, it is true, but that did not put it out of commerce. If it is meant that the land was dedicated to the public for a use which was never abandoned, the evidence does not support the position. As we have seen the government of the United States in 1823 ceded the property to the parish, in unrestricted terms. The parish took no steps afterwards to put it to any public use; before the title vested in the parish, the public had abandoned its use for twenty-three years. The distinction between the Police Jury repre-

senting the inhabitants of the parish, and the inhabitants themselves, is too re-
fined for practical purposes. The plaintiff's counsel, who draws the distinction,
brought his suit in the name of the President of the Police Jury. The Police
Jury never having dedicated the land, either expressly or by acquiescence, to
any public purpose, we cannot infer that it was inalienable merely because it
contained the sepulchres of a few people who died before the present century.
Even the fence which was built around them by the pious hands of their con-
temporaries, has been seen by few persons now living, and it seems never to
have been replaced. The petition does not even allege that the parish desires
to restore the ground to its ancient destination.

III.—Under these facts it can hardly be pretended that the land is essential
to the existence or suitable administration of the parochial government and af-
fairs. Upon this ground it was that our predecessors held in *Egerton* v. *The
Third Municipality of New Orleans*, 1 An. 435, that taxes due to a munici-
pal corporation could not be taken in execution by a judgment creditor of the
corporation, and, on a similar ground, it was held in *The Police Jury* v. *Michel*,
4 An. 84, that court houses, jails, recorder's offices, &c., provided by a parish,
for the use of the State, were not liable to seizure for the debts of the parish.
On the other hand, in *Municipality No. 3* v. *Hart*, 6th An. 573, it was decid-
ed that an ordinary debt due by an individual to the Municipality might be
seized under a judgment against the Municipality, such a debt not falling within
the reason of the rule laid down in the former case.

It may be added to these remarks, that the parish, by the ordinance of Sept.
4th, 1827, which has been cited, and by its silence for twenty-four years, seems
to have acquiesced in the doctrine which we believe to be correct, that, at the
date of the Sheriff's sale, the land in controversy was susceptible of alienation
and was legally sold.

The legislative interpretation of our former laws upon this subject may be
deduced from the Act passed on the 11th March, 1852, (Sess. Acts p. 113)
which provided that thenceforward "all cemeteries of municipal corporations
shall be and are hereby exempted from seizure and sale for debt due by said
municipal corporations."

The parish, as the seized debtor under the execution sued out by *Winter*
and wife, was remotely liable in warranty to *Pargoud*. It would have improved
the moral aspect of the plaintiff's case, if the petition had tendered to *Pargoud*
the money he expended for the land, and which went ultimately to pay the
public debt. A political corporation which venerates the ashes of the dead can
not display too scrupulous a regard for its obligations to the living.

It is ordered that the decree of the District Court be avoided and re-
versed; it is further ordered and decreed that there be judgment for the de-
fendant *Pargoud*, quieting him in his title and possession of the land claimed in
the plaintiff's petition and judgment for the defendants, the heirs of *Jonathan
Morgan* on the claim of *Pargoud* against them in warranty; it is further or-
dered that the plaintiff pay costs in both Courts.