496 So.2d 601 (1986)
Leonard CHARRIER
v.
Louise Lessley BELL, et al.
No. CA 85 0867.
Court of Appeal of Louisiana, First Circuit.
October 15, 1986.
Writ Denied December 19, 1986.
*602 J. Arthur Smith, III, Baton Rouge, for plaintiff-appellant.
Donald Juneau, Arlinda Locklear, Richard Dauphinais, Native American Rights Fund, Washington, D.C., for Tunica-Biloxi Tribe.
Fred G. Benton, Jr., Baton Rouge, for defendants-appellees.
Before EDWARDS, WATKINS and PONDER[*], JJ.
PONDER, Judge, retired.
Plaintiff appealed the trial court's judgment denying both his claim as owner of Indian artifacts and his request for compensation for his excavation work in uncovering those artifacts under the theory of unjust enrichment. We affirm.
Plaintiff is a former Corrections Officer at the Louisiana State Penitentiary in Angola, Louisiana, who describes himself as an "amateur archeologist". After researching colonial maps, records and texts, he concluded that Trudeau Plantation,[1] near Angola, was the possible site of an ancient village of the Tunica Indians. He alleges that in 1967 he obtained the permission of Mr. Frank Hoshman, Sr., who he believed was the owner of Trudeau Plantation, to survey the property with a metal detector for possible burial locations. After locating and excavating approximately 30 to 40 burial plots, lying in a circular pattern, plaintiff notified Mr. Hoshman that he had located the Tunica village. Although the evidence is contradictory, plaintiff contends that it was at that time that Mr. Hoshman first advised that he was the caretaker, not the owner, of the property.
Plaintiff continued to excavate the area for the next three years until he had located *603 and excavated approximately 150 burial sites, containing beads, European ceramics, stoneware, glass bottles; iron kettles, vessels and skillets; knives, muskets, gunflints, balls and shots; crucifixes, rings and bracelets; and native pottery. The excavated artifacts are estimated to weigh two to two and one-half tons.
In search of a buyer for the collection, plaintiff talked to Dr. Robert S. Neitzel of Louisiana State University, who, in turn, informed Dr. Jeffrey D. Brain of Harvard University. Dr. Brain, who was involved in a survey of archeology along the lower Mississippi River, viewed the artifacts and began discussions of their sale to the Peabody Museum of Harvard University. The discussions resulted in the lease of the artifacts to the Museum, where they were inventoried, catalogued and displayed.
Plaintiff initially informed Dr. Neitzel and Dr. Brain that he had found the artifacts in a cave in Mississippi, so as to conceal their source; later he did disclose the actual site of the find to Dr. Brain, who had expressed his concern over the title of the artifacts. Dr. Brain then obtained permission from the landowners to do further site testing and confirmed that it was the true source of the artifacts.
Confronted with the inability to sell the collection because he could not prove ownership, plaintiff filed suit against the six nonresident landowners of Trudeau Plantation, requesting declaratory relief confirming that he was the owner of the artifacts. Alternatively, plaintiff requested that he be awarded compensation under the theory of unjust enrichment for his time and expenses.
The State of Louisiana intervened in the proceeding on numerous grounds, including its duty to protect its citizens in the absence of the lawful heirs of the artifacts. In 1978, the State purchased Trudeau Plantation and the artifacts from the six landowners and agreed to defend, indemnify and hold the prior owners harmless from any and all actions.[2]
In 1981 the Tunica and Biloxi Indians were recognized as an American Indian Tribe by the Bureau of Indian Affairs of the Department of the Interior. The Tunica-Biloxi Indians of Louisiana, Inc. intervened in the instant suit seeking title to the artifacts and the site of the burial ground. At the same time, the tribe removed the action to federal district court, where they also filed a parallel action seeking title to the artifacts. The federal district court, on September 8, 1982, remanded the matter to state court and stayed the parallel action. Charrier v. Bell, 547 F.Supp. 580 (M.D.La. 1982). The Tunicas then withdrew, without prejudice, their claim to the property where the artifacts were located and the State subordinated its claim of title or trust status over the artifacts in favor of the Tunicas.
The trial judge held that the Tunica-Biloxi Tribe is the lawful owner of the artifacts, finding that plaintiff was not entitled to the artifacts under La.C.C. art. 3423 as it read prior to amendment by Act No. 187 of 1982, which required discovery "by chance". The judge also found that plaintiff had no claim to the artifacts on the basis of abandonment under La.C.C. art. 3421, as it read prior to the amendment by Act No. 187 of 1982, because the legal concept of abandonment does not extend to burial goods.
The trial court also denied relief under the theory of unjust enrichment, finding that any impoverishment claimed by plaintiff was a result of his attempts "for his own gain" and that his presence and actions on the property of a third party placed him in a "precarious position, if not in legal bad faith."
The issues before this court are the adequacy of proof that the Tunica-Biloxi Indians are descendants of the inhabitants of Trudeau, the ownership of the artifacts, *604 and the applicability of the theory of unjust enrichment.
Plaintiff first argues that the evidence that the members of the Tunica-Biloxi Indians of Louisiana, Inc., are legal descendants of the inhabitants of Trudeau Plantation was insufficient to entitle them to the artifacts. He asserts that federal recognition of the tribe "merely proves that the Tribe is the best representative of the Tunica Indians for purposes of receiving federal benefits," and points to evidence of intermixing by the Tunica tribe with other tribes.
The fact that members of other tribes are intermixed with the Tunicas does not negate or diminish the Tunicas' relationship to the historical tribe. Despite the fact that the Tunicas have not produced a perfect "chain of title" back to those buried at Trudeau Plantation, the tribe is an accumulation of the descendants of former Tunica Indians and has adequately satisfied the proof of descent. This is evident from the "Final Determination for Federal Acknowledgment of the Tunica-Biloxi Indian Tribe of Louisiana", Fed.Reg. Vol. 46, No. 143, p. 38411 (July 27, 1981), which specifically found that the "contemporary Tunica-Biloxi Indian Tribe is the successor of the historical Tunica, Ofa and Avoyel tribes, and part of the Biloxi tribe". The evidence supports the finding that at least some portion of the Tunica tribe resided at Trudeau Plantation from 1731-1764. No contrary evidence, other than that suggesting intermixing, was presented at the trial of this case. Plaintiff's argument is without merit.
Plaintiff next argues that the Indians abandoned the artifacts when they moved from Trudeau Plantation, and the artifacts became res nullius until found and reduced to possession by plaintiff who then became the owner.
Plaintiff contends that he has obtained ownership of the property through occupancy, which is a "mode of acquiring property by which a thing which belongs to nobody, becomes the property of the person who took possession of it, with the intention of acquiring a right of ownership upon it." La.C.C. art. 3412, prior to amendment by Act No. 187 of 1982.[3]
One of the five methods of acquiring property by occupancy is "By finding (that is, by discovering precious stones on the sea shore, or things abandoned, or a treasure.)" La.C.C. art. 3414, prior to amendment by Act No. 187 of 1982. Plaintiff contends that the artifacts were abandoned by the Tunicas and that by finding them he became the owner.
Both sides presented extensive expert testimony on the history of the Tunica Indians, the French, English and Spanish occupation of the surrounding territory and the presence or absence of duress causing the Tunicas to abandon the Trudeau site.
However, the fact that the descendents or fellow tribesmen of the deceased Tunica Indians resolved, for some customary, religious or spiritual belief, to bury certain items along with the bodies of the deceased, does not result in a conclusion that the goods were abandoned. While the *605 relinquishment of immediate possession may have been proved, an objective viewing of the circumstances and intent of the relinquishment does not result in a finding of abandonment. Objects may be buried with a decedent for any number of reasons. The relinquishment of possession normally serves some spiritual, moral, or religious purpose of the descendant/owner, but is not intended as a means of relinquishing ownership to a stranger. Plaintiff's argument carried to its logical conclusion would render a grave subject to despoliation either immediately after interment or definitely after removal of the descendants of the deceased from the neighborhood of the cemetery.
Although plaintiff has referred to the artifacts as res nullius, under French law, the source of Louisiana's occupancy law, that term refers specifically to such things as wild game and fish, which are originally without an owner. The term res derelictae refers to "things voluntarily abandoned by their owner with the intention to have them go to the first person taking possession." P. Esmein, Aubry & Rau Droit Civil Francais, Vol. II, § 168, p. 46 (7th Ed.1966). Some examples of res derelictae given by Aubry and Rau include things left on public ways, in the cities or to be removed by garbage collectors.
The artifacts fall into the category of res derelictae, if subject to abandonment. The intent to abandon res derelictae must include the intent to let the first person who comes along acquire them. Obviously, such is not the case with burial goods.
French sources have generally held that human remains and burial goods located in cemeteries or burial grounds are not "treasure" under article 716 of the French Civil Code and thereby not subject to occupancy upon discovery. Blancherot v. Couilhy, Bordeaux, 6 Aug. 1806, 38 Dalloz Jurisprudence Genérale, § 186 n. (1), p. 230 (1857). The reasoning has been that any contrary decision would lead to and promote commercial speculation and despoilment of burial grounds. The French commentator Demolombe noted the special treatment that should be given to burial goods, stating that such objects "have not been placed underground with the same intention which informs the deposit of what is called treasure, which in the latter case is, for a temporary period.... Rather, they are an emplacement for a perpetual residence therein...." 13 C. Demolombe, Cours de Code Napoleon § 37, pp. 45-46 (2c ed. 1862).
The same reasoning that the French have used to treat burial goods applies in determining if such items can be abandoned. The intent in interring objects with the deceased is that they will remain there perpetually, and not that they are available for someone to recover and possess as owner.
For these reasons, we do not uphold the transfer of ownership to some unrelated third party who uncovers burial goods. The trial court concluded that La.C.C. art. 3421, as it read prior to passage of Act No. 187 of 1982, was not intended to require that objects buried with the dead were abandoned or that objects could be acquired by obtaining possession over the objections of the descendants. We agree with this conclusion.
The cases cited by plaintiff are distinguishable.
In Touro Synagogue v. Goodwill Industries of New Orleans Area, Inc., 233 La. 26, 96 So.2d 29 (1957), the court found that a cemetery had been abandoned for burial purposes and the owner had the right to sell the property; however, the court conditioned the sale on the disinterment and reinterment (in another cemetery) of the remains of the deceased.
In Ternant v. Boudreau, 6 Rob. 488 (1844), jewelry interred with the decedent was stolen and recovered. The plaintiff claimed the ownership of all such goods on the basis that he purchased the decedent's succession from defendant who was the heir. The court found that the plaintiff was the lawful owner of the jewelry since *606 there had been a valid sale from the descendant. The sale evidenced an express intent by the descendant not to retain ownership of the burial goods.
The court in McEnery v. Pargoud, 10 La.Ann. 497 (1855) found that the temporary use of land as a cemetery, from 1794 to 1800, did not exclude it from commerce. There was no mention of the abandonment of the remains of the dead or the burial goods and there is no inconsistency in that decision and the opinion stated herein.
Humphreys v. Bennett Oil Corporation, 195 La. 531, 197 So. 222 (1940) merely acknowledges that descendants have a cause of action against a person who disturbs a cemetery.
Plaintiff strongly argues that a finding that Indians did not abandon the artifacts will necessarily require the federal court to conclude that the Tunicas did not abandon the real property at Trudeau Plantation and could work havoc with the stability of Louisiana land titles. However, the question of the abandonment of the real property was excluded from the case. This opinion should not be interpreted as making any expression thereon.
Plaintiff next argues that he is entitled to recover a sum of money to compensate his services and expenses on the basis of an actio de in rem verso.
The five criteria of such a claim de in rem verso are:
(1) there must be an enrichment,
(2) there must be an impoverishment,
(3) there must be a connection between the enrichment and resulting impoverishment,
(4) there must be an absence of justification or cause for the enrichment and impoverishment, and
(5) there must be no other remedy at law available to plaintiff.

Creely v. Leisure Living, Inc. 437 So.2d 816 (La.1983);

Edmonston v. A-Second Mortgage Company of Slidell Inc., 289 So.2d 116 (La.1974).
We first question whether there has been an enrichment. While the nonresident landowners were "enriched" by the sale of the property to the state, the ultimate owners of the artifacts presented substantial evidence that the excavation caused substantial upset over the ruin of "ancestrial burial grounds," rather than any enrichment.
Even if the Indians have been enriched, plaintiff has failed to prove that he has sustained the type impoverishment for which de in rem verso, may be used. His alleged loss resulted from the hours he spent excavating the artifacts, the greater portion of which activity was done at a time when plaintiff knew he was on property without the consent of the landowner. While contradictory testimony was presented regarding whether plaintiff initially had permission to go on the property, and whether that permission was adequate, by his own admission, plaintiff was informed by Hoshman that he did not own the property before the cessation of the excavating. Plaintiff's knowledge is further evidenced by his attempts to keep the location of his work secret; he did not identify Trudeau Plantation as the location of the find for almost five years after his discovery and he failed to seek out the landowners of the property until it was required for sale negotiations, although he removed two and one half tons of artifacts from their property. Plaintiff further acknowledges that he knew that the Tunica Indians might object to his excavations.
The actio de in rem verso, explained by the Louisiana Supreme Court in Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1967) and derived from the similar French action, is influenced greatly by French Civil Code articles from which our own are copied. Minyard, 205 So.2d 432. The impoverishment element in French law is met only when the factual circumstances show that it was not a result of the plaintiff's own fault or negligence or was not undertaken at his own risk. Comment, Actio De In Rem Verso in Louisiana; Minyard *607 v. Curtis Products, Inc., 43 Tul.L.Rev. 263, 286 (1969); Brignac v. Boisdore, 288 So.2d 31, 35 n. 2 (La.1973). Obviously the intent is to avoid awarding one who has helped another through his own negligence or fault or through action taken at his own risk. Plaintiff was acting possibly out of his own negligence, but more probably knowingly and at his own risk. Under these circumstances, plaintiff has not proven the type of impoverishment necessary for a claim of unjust enrichment.
Additionally, plaintiff has failed to show that any enrichment was unjustified, entitling him to an action to recover from the enriched party. An enrichment will be unjustified "only if no legal justification for it exists by reason of a contract or provision of law intended to permit the enrichment or the impoverishment or to bar attack upon the enrichment." Justice A. Tate, The Louisiana Action for Unjustified Enrichment, 50 Tul.L.Rev. 883, 904 (1976). Any enrichment received by the Tribe was justified. Humphreys v. Bennett Oil Corp., 195 La. 531, 197 So. 222 (1940); Choppin v. LaBranche, 48 La.Ann. 1217, 20 So. 681 (1896). In Humphreys, the court recognized a right of action to recover damages for mental anguish and pain and suffering for desecration of a cemetery, while Choppin allowed injunctive relief against a tomb owner threatening to remove remains of the dead. Thus, descendants have a right to enjoin the disinterment of their deceased relatives, as well as to receive damages for the desecration involved. Such a right would be subverted if descendants were obliged to reimburse for the expenses of the excavation. See V & S Planting Company v. Red River Waterway Commission, 472 So.2d 331 (La.App. 3rd Cir.1985), writ denied, 475 So.2d 1106 (1985); G. Woodward Jackson Co., Inc. v. Crispens, 414 So.2d 855 (La.App. 4th Cir.1982). There is a legal justification for any enrichment received by the Tribe and plaintiff is not entitled to invoke the equitable theory.
For these reasons the judgment of the trial court is affirmed at appellant's costs.
AFFIRMED.
NOTES
[*] Judge, Elven E. Ponder, retired, has been assigned temporarily to this court by the Supreme Court of Louisiana to fill the vacancy created by the election of Justice Luther F. Cole to the Supreme Court.
[1] Trudeau Plantation consists of approximately 150 acres located on a bluff in the southeast quadrant of the meeting of the Mississippi River and Tunica Bayou. Angola is on the other side of the bayou.
[2] Plaintiff filed a motion for litigous redemption which was granted by the trial court, but rejected by this court. The matter was remanded for trial. Charrier v. Bell, 380 So.2d 155 (La.App. 1st Cir.1979).
[3] La.C.C. art. 3412, 3414 and 3421 cited herein were repealed by Acts 1982, No. 187, § 1, effective January 1, 1984. The provisions replacing those articles reproduce their substance. Although the language has changed, they do not change the law. See specifically La.C.C. art. 3412 and 3418, as adopted by Acts 1982, No. 187, § 1 and the comments. The articles previously read as follow:

La.C.C. art. 3412
Occupancy is a mode of acquiring property by which a thing which belongs to nobody, becomes the property of the person who took possession of it, with the intention of acquiring a right of ownership upon it.
La.C.C. art. 3414
There are five ways of acquiring property by occupancy, to wit:
By hunting.
By fowling.
By fishing.
By finding (that is, by discovering precious stones on the sea shore, or things abandoned, or a treasure.)
La.C.C. 3421
He who finds a thing which is abandoned; that is, which its owner has let [left] with the intention not to keep it any longer, becomes master of it in the same manner as if it had never belonged to any body.