557 So.2d 753 (1990)
WILSON OIL COMPANY, INC., Plaintiff-Appellant,
v.
CENTRAL OIL & SUPPLY CORP., Roland Carter, and Billy R. Wollerson, Defendants-Appellees.
No. 21271-CA.
Court of Appeal of Louisiana, Second Circuit.
February 28, 1990.
Rehearings Denied March 29, 1990.
Writs Denied May 25, 1990.
Smith, Taliaferro, Seibert, Boothe & Purvis, Jonesboro by V. Russell Purvis, for plaintiff-appellant.
Kneipp & Hastings, Monroe by Donald L. Kneipp, for defendants-appellees, Cent. Oil & Supply and Billy R. Wollerson.
Percy A. Ford, Jr., West Monroe, for defendant-appellee, Roland Carter.
*754 Before MARVIN, SEXTON and NORRIS, JJ.
MARVIN, Judge.
In this action that arose when a lessee and gasoline retailer (Wollerson) and his lessor (Carter) mutually agreed in 1987, after a two-year relationship, to cancel a 1985 eight-year lease of the service station property, Wilson Oil Co., Inc., Wollerson's supplier of gasoline, appeals a judgment rejecting its demands which included the value of pumps, tanks and other improvements it installed in and on the leased premises under its verbal agreement to supply Wollerson with gasoline and other products.
The primary defendant is Central Oil & Supply Corporation, a gasoline supplier and competitor of Wilson, who paid Wollerson $322,000 for his business (inventory and movable furnishings) and became the lessee and operator of the station in 1987 under a new five-year lease with Carter for monthly rent that was about $500 higher than Wollerson had been paying Carter.
The trial court found that Wilson's verbal agreement with Wollerson to install the equipment necessary to sell its gasoline failed to specify a definite term, contrary to Wilson's argument that a "10-year term" was agreed to or was "customarily" contemplated in such a supply agreement.
Central stipulated it owed Wilson $7,312 for the value of gasoline in the underground tanks when it became the operator-lessee of the station in 1987. The judgment awarded Wilson this amount. Wilson seeks to increase the judgment by its lost profits and its expense in installing the necessary equipment on and in the leased premises.
We amend to increase the judgment by $23,000, which we find is the fair value of the underground tanks that Central agreed in its contract with Wollerson to pay Wilson.
We affirm the judgment as amended.

FACTS
In early 1985 Carter agreed to lease the undeveloped land to Wollerson and to finance the construction of improvements for a gas station and convenience store on Interstate Highway 20 to be called Billy's Gas and Go. On May 15, 1985, Carter and Wollerson signed an eight-year lease, effective July 1, 1985. Notice of the lease was filed in the public records on May 16, 1985. Construction was completed and the business opened on July 1, 1985.
Wollerson negotiated with several bulk suppliers, including Wilson and Central, before he made a "handshake" verbal agreement with Wilson to buy gasoline exclusively from Wilson in return for Wilson's installing the necessary equipment at the station.
Wollerson's lease with Carter clearly stated that any improvements made by Wollerson would be owned by Carter when the lease terminated. After concluding his negotiations with Wilson, through Mike Wilson, who was the principal owner and executive officer of the corporation, Wollerson introduced Mike Wilson to Carter in Carter's office. Carter testified that, during a 10-15 minute meeting, he effectively explained to Wilson that
Anything that is put on the property, except the underground tanks, belongs to me, and you need to understand that in making your deal with Wollerson. If you remove the tanks, you must put the property back in the condition it was in before the tanks were installed.
Carter testified that he disclaimed the tanks, notwithstanding the provision in the recorded lease that he would own all equipment installed on the leased premises, because he understood the tanks were hazardous when empty.
Wilson testified that Carter said nothing about ownership of the equipment at this meeting and merely gave his approval to Wilson's agreement with Wollerson. Wollerson neither recalled nor denied that Carter claimed ownership of any of the equipment.
Mike Wilson said he "understood from the outset" the agreement to supply products to Wollerson would endure for a ten-year term. Wollerson testified that no *755 term was discussed until June 1986 when he offered to buy the equipment Wilson had installed because he had had such a profitable first year.
According to Wollerson, Wilson declined his offer to buy the equipment because Wollerson had "leased" the equipment from Wilson for ten years as a part of the supply agreement. Wollerson said he attempted to explain to Wilson that he could not have a ten-year lease with Wilson because he only had an eight-year lease with Carter. Wilson did not recall the details of this conversation, but acknowledged that Wollerson sought several times to buy the equipment, believing that his sale of the business to Central would be facilitated if Wollerson owned the equipment.
After his conversation with Wollerson, Wilson drafted and presented to Wollerson and Carter in June 1986 a "purchase agreement" under which Wollerson and Carter would agree to use Wilson as the exclusive supplier for the station for ten years beginning July 1, 1985, in return for Wilson's installation of the equipment at the station. Under this proposed written agreement, Wilson would "own" the equipment it had installed. Wollerson and Carter declined to sign Wilson's written proposal.
On May 1, 1987, Wollerson and Central signed an agreement whereby Central would buy Wollerson's business, assets and inventory. The equipment Wilson had installed in 1985 was expressly excluded from the purchase agreement and from the Wollerson-Central sale that was executed May 20, 1987. Upon joining with Wollerson in formally cancelling the 1985 eight-year lease, Carter executed a new lease with Central Oil. This lease also provided that any improvements made by the lessee would belong to Carter.
Before Central acquired Wollerson's business, Central's CEO, Hardeman Cordell, told Wilson's CPA, Maurice Linam, that Central would pay for the equipment Wilson had installed at the station, subject to credits that Central claimed from dealings with Wilson Oil at a location in Ferriday, La. Cordell asked for, and Linam provided at the Wollerson-Central sale closing, invoices to Wilson totaling about $137,000 that represented what it cost Wilson to purchase and install the equipment at Wollerson's station and the value of the gasoline in the underground tanks at the time of the sale by Wollerson to Central. About ten days later, Central's attorney wrote to Wilson's attorney:
Confirming our telephone conversation of Friday, May 22, 1987, please be advised that Central Oil & Supply Corporation stands ready to pay Wilson Oil Company the fair value of the petroleum distribution equipment located at Billy's Gas and Go as long as it receives an equivalent credit for its petroleum distribution equipment which was and/or is being used by Wilson Oil Company at the convenience store formerly known as "Wagoner's Stop'N Go", Ferriday, Louisiana. It is my understanding that Mike Wilson has furnished invoices totaling approximately $137,000.00 representing the cost of the petroleum distribution equipment at Billy's Gas and Go. My notes reflect that Central Oil & Supply Corporation's cost of the petroleum distribution equipment at Wagoner's Stop'N Go approximates $55,000.00. This certainly seems like a fair basis upon which to settle everything once and for all.
Once you have had an opportunity to review this and discuss it with your client, I look forward to hearing back from you.
An appeal in the Ferriday litigation was pending when Central's attorney wrote the above letter. About a month later, the judgment of the trial court in the Ferriday litigation, which dismissed Central's claim against Wilson, was affirmed. See Central Oil & Supply v. Wilson Oil Co., 511 So.2d 19 (La.App. 3d Cir.1987), writ denied. Central Oil made no payments to Wilson Oil for the gas or the equipment it used at Billy's Gas and Go.
About a month after Wilson instituted his action in August 1987, Carter wrote Wilson, claiming ownership of the canopy, fascia and concrete, and granted Wilson 90 days to remove the underground tanks or thereafter forfeit the tanks to Carter under *756 CC Art. 493. That article recognizes that buildings and "other constructions permanently attached to the ground" belong to the person who made them if they are made with the landowner's consent, and provides that the landowner acquires ownership of the improvements, with no obligation to pay for them, if the person who installed them does not remove them within 90 days after the landowner demands their removal.
Carter filed an answer and third party demand against Wollerson, Cordell and Central Oil on October 2, 1987. Carter denied entering into any gas purchase agreement with Wilson and claimed he told Wilson that the canopy, fascia and concrete edifices would remain his when Wollerson's agreement with Wilson Oil ended. Carter filed an amended answer and reconventional demand against Wilson in June 1988, claiming ownership of the tanks because Wilson Oil had not removed them within the 90-day period. Carter testified that he did not claim any of the "operational type things" such as the pumps and the cash register, comprising about $40,000 of Wilson Oil's $130,000 claim, but only the "building type things," including the canopy, fascia and concrete structures, the 13-foot Texaco sign, and the tanks that were not removed after demand.

TRIAL COURT RULING
Denying Wilson's claims for lost profits, the trial court found there was no "meeting of the minds between Wollerson and Wilson Oil concerning any definite period of time during which Wollerson was obligated to buy petroleum products from Wilson."
The trial court also denied Wilson's claims against Carter and Central for the cost of the equipment Wilson purchased and installed. The court believed Carter's testimony that he told Mike Wilson at the outset that any improvements made to the property, excluding the tanks, would belong to Carter. The court found that the tanks were "component parts" of immovable property under CC Art. 495, rather than "other constructions permanently attached to the ground" under Art. 493. Under this analysis, the court found that Carter could have been held liable for "the current value of these tanks [or] ... the enhanced value of the immovable," but denied recovery because Wilson Oil did not prove either of these values.
Central stipulated at trial that it owed Wilson Oil for the gasoline in the tanks ($7,312) on May 20, 1987, and was cast for judgment accordingly. With respect to Wilson's other claims against Central, the trial court found that Central's initial offer to pay Wilson for the equipment was based on the mistaken assumption that Wilson Oil owned it. Reasoning that the equipment was owned by Carter, who leased it to Central, the court found that Central was not liable to Wilson either for conversion of the equipment or under the principle of unjust enrichment.
The court rejected Wilson's unjust enrichment claims against Wollerson and Carter on the grounds that Wollerson excluded the equipment when he sold to Central and that
Carter's position was made clear in the beginning and was of public record by the declaration of lease. Wilson well knew that he was placing equipment and improvements on the property of another and did not adequately provide for his own protection. It cannot, therefore, be held that there is an absence of justification or cause for any enrichment of Carter or his property ...
Wilson contends on appeal that the trial court erred in finding that Carter owned the equipment and that Wilson did not prove each of the agreements it claimed to have with Wollerson, Carter and Central.

EQUIPMENT
CC Arts. 493 and 495, governing ownership and reimbursement rights when one person makes improvements on another's land, apply only in situations where those rights are not regulated by agreement of the parties. See Symeonides, Developments in the Law, 1983-1984Property, 45 La.L.Rev. 541, 546 (1984) and Symeonides, Developments in the Law, 1985-1986Property, 47 La.L.Rev. 429, 447 *757 (1986). The author concludes that "it is a common secret by now that this entire area of the Civil Code resembles a pile of `cans of worms'[.]" 47 La.L.Rev. at 451. The ownership problems here are resolved by the express and implied agreements of the litigants and application and discussion of the codal articles is not necessary.
After hearing conflicting testimony, the trial court found that Carter claimed ownership of anything attached to the property, except the underground tanks, when Carter met with Wilson and Wollerson before the installation began, and that Wilson agreed to or accepted Carter's claim by performing the work. We agree. These findings are supported by the record.
Carter disclaimed ownership of the underground tanks in the initial meeting with Wilson and in letters his attorney wrote to Wilson's attorney in early 1987 during Wilson's unsuccessful attempt to obtain a signed gas purchase contract. In his answer to Wilson's petition, Carter stated that he
knew that Wilson Oil Company would be entitled to some opportunity to reclaim some items of property located on the property in question or be compensated therefor [and that Carter] was assured [by Cordell] that all of this would be taken care of prior to or at the closing [of Wollerson's sale of the business to Central Oil].
Carter later filed an amended answer and reconventional demand claiming ownership of the tanks because Wilson Oil had not removed them within 90 days of Carter's demand, made shortly after this suit was filed, in reliance on CC Art. 493. We have determined the code article is not applicable. In the two years before suit was filed, Carter consistently excluded the tanks from his ownership claims. On this record and notwithstanding Carter's later claims, we must find that the underground tanks were owned by Wilson, and not by Carter, when Central acquired the business on May 20, 1987.
Central Oil's Cordell testified that when a service station changed suppliers, it was customary in the industry for the new supplier to pay the initial supplier for its equipment rather than having it removed. Cordell said he knew Wilson claimed ownership of some of the equipment and that he offered to "work out an acceptable price with Wilson Oil for what was theirs" before Central bought the business from Wollerson.
Although Central's letter offering to pay "fair value" for the equipment contemplated offsetting Central's $55,000 claim against Wilson Oil in the Ferriday litigation against Wilson's $137,000 claim here, this suggested settlement aborted when the judgment dismissing Central's claim in the Ferriday litigation became final in the summer of 1987. Central nevertheless continued to use Wilson's tanks without "working out an acceptable price" for them, as Cordell had expressly agreed to do, under what he said was industry custom.
The trial court found that all of the equipment was owned by Carter and that "[t]here was no contract between Central and Wilson and no consideration proven to support an agreement under which Central obligated itself to pay Wilson [for Carter's equipment]." We agree that Carter owned all of the equipment except the tanks on May 20, 1987.
As we have attempted to explain, we have found the tanks had been disclaimed and were not owned by Carter, but by Wilson on May 20, 1987. Cordell admitted that he agreed to pay Wilson "for what was theirs" and continued using the equipment. We must find the trial court was clearly wrong in concluding that there was no contractual basis for recovery by Wilson against Central for the "fair value" of the tanks, which were Wilson's when Central became the lessee of the property on May 20, 1987.
Wilson spent about $39,000 to have the tanks installed by Steve Cagle of C & J Pump Service. On cross-examination by Central's attorney, Cagle testified that the tanks did not meet current EPA regulations. Cagle estimated it would cost about $2,000 to upgrade the tanks for EPA compliance.
*758 Wilson's CPA testified that the equipment would customarily be depreciated from the initial cost when sold from one supplier to another. He said he did not assist Mike Wilson in calculating the asking price for this equipment. Wilson said he used the initial cost, without depreciation, because the business had proven to be successful by the time Central acquired it.
Cordell testified that when Central is replaced by another supplier who buys Central's equipment, the "fair value" payment for the equipment has never equaled Central's claimed initial cost. Cordell estimated the "fair value" of the petroleum distribution equipment at Billy's Gas and Go ("the submerged pumps and the dispensers and this sort of thing"), excluding the building fascia and canopy, to be $25,000. We shall amend the judgment against Central to increase the award by $23,000, considering Cagle's estimate that it would cost $2,000 to upgrade the tanks to EPA specifications. CCP Art. 2164.

LOST PROFITS
Wilson sought to recover lost profits from both Wollerson and Carter, alleging that each agreed to use Wilson as the exclusive supplier for the station for ten years. The trial court found that Carter did not agree to buy any products from Wilson Oil. This finding is fully supported by the record. Mike Wilson admitted he knew Carter was not involved in the operation of the station. Wilson agreed with Carter's testimony that during the short meeting between Carter, Wollerson and Wilson, Carter made it clear that Wilson's "deal" to supply gas to the station was with Wollerson and not with Carter.
Wilson and Cagle, who installed the equipment, testified that Wollerson agreed to buy gas exclusively from Wilson for ten years. Wollerson admitted that he agreed to buy gas exclusively from Wilson Oil, but said he and Wilson did not discuss a term for this agreement. Wollerson said he first became aware of Wilson's "understanding" or contention that the agreement had a ten-year term in the conversation with Wilson about a year after the station opened.
Shortly after Wollerson expressed his disagreement with Wilson's contention in 1986 that the term of their 1985 verbal agreement was "ten years," Wilson prepared the "purchase agreement" with a ten-year term, and sought the signatures of Wollerson and Carter. Neither Wollerson nor Carter signed the agreement. The trial court found, as did another court when Wilson claimed lost profits in reliance on an unsigned five-year contract to supply gas to a station in Vidalia, that "the failure to sign the written ... agreement is the clearest indication that the parties never agreed to the terms contained in it." See Wilson Oil Co., Inc. v. Clary, 432 So.2d 1120, 1121 (La.App. 3d Cir. 1983), writ denied.
When a contract does not have a stipulated term, courts will infer a reasonable term from the nature of the contract and the circumstances of the case, including the amount of time necessary for the supplier to recoup its investment and the prevailing practice with similar contracts. LeBlanc v. City of Plaquemine, 448 So.2d 699, 703, fn. 5 at p. 705 (La.App. 1st Cir. 1984). See also Caston v. Woman's Hospital Foundation, Inc., 262 So.2d 62 (La. App. 1st Cir.1972), writ denied.
Although Wilson said that a 10-year exclusive supply term was "common practice in the industry" for a supplier who purchased and installed the retailer's equipment (here $130,000), Wilson testified his company earned $140,000 in gross profits during the two years Wilson supplied Wollerson.
Under these circumstances, we cannot find the trial court erred in not "extending" or finding a reasonable term to be more than two years. Wilson had the burden of proving that some term in excess of the two-year actual supply period was "reasonable" under the circumstances. As in the case of its burden of proving an express or implied term of the verbal agreement, Wilson failed in its burden of proving a "reasonable" term greater than two years under this record.

UNJUST ENRICHMENT
Wilson contends that if Carter owns the equipment and Central is allowed to *759 use it, both have been unjustly enriched and Wilson has been impoverished by the loss of the equipment. In the light of the amount of Wilson's gross profits for almost two years and our increase in the judgment against Central for the fair value of the tanks, we cannot agree that Wilson has been "impoverished."
Additionally, it has been noted that the French authorities, from which the action for unjust enrichment is derived, recognize "impoverishment" only when the factual circumstances show that it did not result from the plaintiff's own fault or negligence or from actions undertaken at his own risk. Charrier v. Bell, 496 So.2d 601 (La.App. 1st Cir.1986), writ denied, and authorities cited therein at pp. 606-607. We cannot relieve Wilson from a "bad" verbal agreement.
In the face of the adverse decision in Wilson Oil Co., Inc. v. Clary, supra, which became final about two years before Wilson installed the equipment for Wollerson, Wilson clearly undertook the venture at its own risk without having a signed contract for a definite term. The claim for unjust enrichment is denied.

DECREE
The judgment is amended to increase the award against Central Oil by $23,000, and, at Central's cost, as amended, is affirmed.

ON APPLICATION FOR REHEARING
Before MARVIN, SEXTON, NORRIS, HALL and LINDSAY, JJ.
Rehearing denied.